## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**William David Franklin,**
**Petitioner Below, Petitioner**

**vs) No. 15-0549** (Mercer County 13-C-378-DS)

**Anne Thomas, Warden,**
**Parkersburg Correctional Center,**
**Respondent Below, Respondent**

**FILED**

**February 16, 2016**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner William David Franklin, by counsel Paul R. Cassell, appeals the Circuit Court of Mercer County's May 8, 2015, order denying his petition for writ of habeas corpus. Respondent Anne Thomas, Warden, by counsel Laura Young, filed a response. On appeal, petitioner alleges that the circuit court erred in denying his habeas petition on the following grounds: ineffective assistance of trial counsel; the plea was not knowingly, intelligently, and voluntarily made; and violation of constitutional proportionality standards.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In September of 2011, petitioner was charged, by information, with two counts of attempt to commit a felony, one count of conspiracy, one count of grand larceny, and one count of Delivery of a Schedule II Controlled Substance. Petitioner consented to the information's filing. On the same date, petitioner entered into a guilty plea to all five crimes. Pursuant to the plea agreement, the State agreed not to prosecute petitioner for any currently pending or known criminal violations and would not seek enhancement of his sentence. The State further agreed to remain silent at sentencing. In November of 2011, the matter was transferred from Judge Aboulhosn to Judge Swope and sentencing was rescheduled several times until it was ultimately set for January 23, 2012. On December 28, 2011, petitioner's bond was revoked.

In January of 2012, petitioner was again placed on bond and entered the Legends treatment facility. The circuit court again continued sentencing pending his completion of that program. In April of 2012, petitioner's probation officer moved to revoke his bond due to his discharge from Legends on March 9, 2012. Petitioner was bonded out on April 12, 2012, to seek further treatment and was placed on home incarceration.

1

In May of 2012, petitioner was ultimately sentenced to the following terms of incarceration: one to three years for each of the two counts of attempt to commit a felony; one to five years for the count of conspiracy; one to ten years for the count of grand larceny; and one to fifteen years for the count of Delivery of a Schedule II Controlled Substance. At that time, the circuit court suspended his sentence and placed him on probation for five years. However, in October of 2012, petitioner was arrested for breaking and entering and grand larceny. A few days later, the State filed a petition to revoke his probation based upon these grounds and the additional allegation that he either failed or provided diluted drug screens. On November 8, 2012, the State filed an amended petition and alleged that petitioner failed to appear for drug screenings. After a contested hearing that same month, the circuit court revoked petitioner's probation and imposed his original cumulative sentence of five to thirty-six years of incarceration.

In September of 2013, petitioner filed a pro se petition for writ of habeas corpus in the circuit court. Thereafter, petitioner was appointed counsel and filed an amended petition on August 5, 2014. In his amended petition, petitioner asserted the following grounds for relief: ineffective assistance of trial counsel; guilty plea was not knowingly, intelligently, and voluntarily made; violation of constitutional rights by a disproportionate sentence; cruel and unusual punishment; illegal or coerced confession; discrimination in enforcement of the law; and several other available grounds in the *Losh* checklist.[1] In August of 2014, the circuit court held an omnibus evidentiary hearing on the habeas petition, after which it denied the same. It is from this order that petitioner appeals.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

On appeal to this Court, petitioner alleges that he was entitled to habeas relief because his trial counsel was ineffective, his plea was not entered into knowingly, intelligently, and voluntarily, and his sentence violates constitutional proportionality standards. The Court, however, does not agree.

Upon our review and consideration of the circuit court's order, the parties' arguments, and the record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on these alleged errors, which were also argued below. Indeed, the

---

[1] *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981).

circuit court's order includes well-reasoned findings and conclusions as to the assignments of error raised on appeal. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignment of error raised herein and direct the Clerk to attach a copy of the circuit court's May 8, 2015, "Order Denying The Petitioner's Petition For Writ Of Habeas Corpus Ad Subjiciendum And Removing It From The Court's Active Docket" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** February 16, 2016

**CONCURRED IN BY:**

Chief Justice Menis E. Ketchum
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Allen H. Loughry II

RECEIVED

MAY 1 1 2015

CASSELL & CREWE P.C.

15-0549

NOTED CIVIL DOCKET

MAY 08 2015

JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

# IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA, *ex rel,*
WILLIAM DAVID FRANKLIN,                                    PETITIONER,

v.                          Civil Action No. 13-C-378-DS

JOHN J. SHEELY, ADMINISTRATOR
EASTERN REGIONAL JAIL,                                    RESPONDENT.

## ORDER DENYING THE PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM AND REMOVING IT FROM THE COURT'S ACTIVE DOCKET

On August 13, 2014, this matter came before the Court, the Honorable Derek C. Swope presiding, for a hearing on the Petitioner's Petitions for Writ of Habeas Corpus Relief, brought pursuant to the provisions of Chapter 53, Article 4A of the West Virginia Code, as amended, which were filed by the Petitioner, *pro se*, and also by and through his court-appointed counsel, Paul R. Cassell, Esq. The Petitioner filed a *pro* se Petition for Writ of Habeas Corpus on September 16, 2013. Counsel for the Petitioner filed an Amended Petition for Writ of Habeas Corpus on August 5, 2014. The State filed its Response on August 11, 2014. The Petitioner and his counsel appeared for the omnibus hearing. John McGinnis, IV, Esq., Assistant Prosecuting Attorney, appeared on behalf of the State of West Virginia.

The Petitioner is seeking post-conviction habeas corpus relief from his November 19, 2012 sentence for not less than one (1) nor more than (3) years as provided by law for two counts of Attempt to Commit a Felony, not less than one (1) nor more than five years as provided by law for Conspiracy, not less than one (1) nor more than ten (10) years as provided by law for Grand Larceny, and not less than one (1) nor more than fifteen (15) years for Delivery of a

1

Schedule II Controlled Substance, to-wit: Hydromorphone, absent a showing that he is being unlawfully detained due to prejudicial constitutional errors in the underlying criminal proceedings.

Whereupon, the Court, having reviewed and considered the Petition, the court files, the transcripts, the argument of counsel and the pertinent legal authority, does hereby **DENY** the Petitioner's Petition for Writ of Habeas Corpus Relief.

In support of the aforementioned ruling, the Court makes the following General Findings of Fact and Conclusions of Law:

## I. FACTUAL/PROCEDURAL HISTORY

1. **Case No. 11-F-257**

### A. The Information

On September 29, 2011, the Prosecuting Attorney of Mercer County, West Virginia, filed an Information charging the Petitioner with two (2) counts of Attempt to Commit a Felony, one (1) count of Conspiracy, one (1) count of Grand Larceny, and one (1) count of Delivery of a Schedule II Controlled Substance, to-wit: Hydromorphone. This felony information was filed with the Petitioner's consent, as witnessed by the Waiver of Indictment filed on the same date. This action was assigned to the Honorable Omar J. Aboulhosn.

### B. The Plea Hearing

On the same date, the Petitioner, represented by Phillip Ball,Esq., entered a plea of guilty before Judge Aboulhosn. The plea bargain agreement indicated that the Petitioner would plead guilty to these five (5) charges. The State agreed not to prosecute the Petitioner for any currently pending or known criminal violations and not to seek

2

enhancement of his sentence. It also agreed to remain silent at sentencing. The Petitioner agreed to give truthful testimony at all criminal proceedings relating to matters covered by the Plea Agreement. The punishments were set out, along with the statement that the Petitioner could not withdraw his plea if there was an unpleasant result.

## C. Sentencing

On November 22, 2011, this action was transferred from Judge Aboulhosn to the undersigned Judge. Sentencing was scheduled for November 28, 2011, rescheduled to December 19, 2011 and set for January 23, 2012. On December 28, 2011, the Petitioner's bond was revoked.

Thereafter, on January 17, 2012, the Petitioner was placed on bond and entered the Legends treatment facility. His sentencing was postponed pending his completion of that program. On April 10, 2012, Probation Officer Kimberly Moore moved to revoke his bond due to his discharge from Legends on March 9, 2012. The Petitioner was bonded out on April 12, 2012 to seek further treatment, and was placed on GPS home confinement.

On May 22, 2012, the Petitioner was sentenced as follows:

Therefore, it is **ORDERED** that the said William David Franklin, II be taken from the bar of this Court to the Southern Regional Jail and therein confined until such time as the warden of the penitentiary can conveniently send a guard for him and that he be taken from the Southern Regional Jail to the penitentiary of the State and therein confined for the indeterminate term of not less than one (1) nor more than three (3) years as provided by law for each lesser included offense of "Attempt to Commit a Felony" as the State in Counts 1 and 4 of its Information

3

herein hath alleged and as by his plea he hath admitted; not less than one (1) nor more than five (5) years as provided by law for the offense of "Conspiracy" as the State in Count 2 of its Information herein hath alleged and as by his plea he hath admitted; not less than one (1) nor more than ten (10) years as provided by law for the offense of "Grand Larceny" as the State in Count 3 of its Information herein hath alleged and as by his plea he hath admitted; and not less than one (1) nor more than fifteen (15) years as provided by law for the offense of "Delivery of a Schedule II Controlled Substance, To-Wit: Hydromorphone" as the State in Count 5 of its Information herein hath alleged and as by his plea he hath admitted; that these sentences run consecutively with one another; and that the defendant be dealt with in accordance with the rules and regulations of that institution and the laws of the State of West Virginia.

His sentence was suspended and he was placed on probation for five (5) years on "under the general rules and regulations as established by law with the following specific conditions":

1. That the defendant pay all court costs within one (1) year, or be subject to having his driver's license suspended;

2. That the defendant obey all laws;

3. That the defendant refrain from consuming alcohol/drugs (unless prescribed), frequenting places where such may be present, and associating with those who use such substances;

4. That the defendant be subject to random urinalysis for the purpose of alcohol/drug screens beginning today;

5. That the defendant obtain within 60 days and maintain employment;

6. That the defendant attend the day report center;

4

7. That the defendant see his probation officer twice per month until reduced by probation officer;

8. That the defendant provide probation officer proof of all prescriptions;

9. That the defendant execute a consent to search;

10. That the defendant execute an authorization for the release of his medical records;

11. That the defendant pay restitution in the sum of $4,236.00;

12. That the defendant pay outstanding home confinement fees.

After a period of supervision, Probation Officer Krista Ellison requested that the Petitioner be excused from his attendance at the Day Report Center because he had been drug-tested 45 times, with all negative results, and had a new employment opportunity. The Court granted this request on September 4, 2012.

## D. Probation Revocation

The Petitioner was arrested for Breaking and Entering and Grand Larceny on October 31, 2012. A Petition for probation revocation was filed on November 1, 2012, alleging this and other grounds, principally failed or diluted drug screens.

An Amended Petition was filed on November 8, 2012, further alleging the Petitioner's failure to appear for color-code drug screenings.

After a contested hearing on November 19, 2012, the Petitioner's probation was revoked and he was sentenced to the penitentiary as aforesaid – the effective length of his sentence is five (5) to thirty-six (36) years.

## E. Additional Proceedings

The Petitioner has filed *pro se* motions for reconsideration, for probation, and for home confinement.

5

## II. THE PETITIONER'S *PRO SE* PETITION UNDER W. VA. CODE §53-4a-1 FOR WRIT OF HABEAS CORPUS; THE PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM IN SUPPORT OF AMENDED PETITION FOR WRIT OF HABEAS CORPUS; THE *LOSH* CHECKLIST; THE RESPONDENT'S ANSWER; THE OMNIBUS HEARING

### A. The *Pro Se* Petition:  Civil Action No. 13-C-378

On September 16, 2013, the Petitioner filed his Petition for Writ of Habeas Corpus in the Circuit Court of Mercer County.  The Petitioner raised the following grounds in his Petition:

1. Counsel was ineffective for not filing a Rule 35(b) Motion for Reconsideration in a timely manner.

2. Illegal and/or coerced confession.

3. Discrimination in enforcement of law.

The Court appointed Paul R. Cassell, Esq., to represent the Petitioner in this proceeding.

### B. The Amended Petition for Writ of Habeas Corpus and Memorandum in Support of Amended Petition for Writ of Habeas Corpus

On August 5, 2014, the Petitioner, by counsel filed an Amended Petition for Writ of Habeas Corpus.  It raised the following grounds:

1. Petitioner's Trial Counsel was ineffective.

2. The Guilty Plea was not knowingly, intelligently, and voluntarily made.

3. Petitioner's State and Federal Constitutional Rights were violated by his Disproportionate Sentence.

4. Petitioner's Federal and State Constitutional Rights were violated by the Cumulative Effects of the Errors cited herein.

5. Petitioner is being subjected to cruel and unusual punishment.

6. Petitioner also asserts all additional grounds raised in his *Losh* checklist and in his *pro se* Petition.

The Amended Petition requested that the Court grant his Petition and issue a Writ of Habeas Corpus on his behalf.

## C. THE *LOSH* CHECKLIST

Counsel also filed the *Losh* checklist on August 5, 2014 with grounds as follows:

**Waived Grounds:**

In his *Losh* checklist the Petitioner waived the following grounds for relief:

- Trial court lacked jurisdiction

- Statute under which conviction was obtained was unconstitutional

- Indictment shows on face no offense was committed

- Prejudicial pretrial publicity

- Denial of right to speedy trial

- Language barrier to understanding the proceeding

- Suppression of helpful evidence by prosecutor

- State's knowing use of perjured testimony

- Falsification of a transcript by prosecutor

- Information in pre-sentence report erroneous

- Double jeopardy

- Irregularities in arrest

- Excessiveness or denial of bail

- No preliminary hearing

- Illegal detention prior to arraignment

- Irregularities or errors in arraignment

7

- Challenges to the composition of grand jury or its procedures

- Failure to provide copy of indictment to defendant

- Defects in indictment

- Improper venue

- Pre-indictment delay

- Refusal of continuance

- Refusal to subpoena witnesses

- Prejudicial joinder of defendants

- Lack of full public hearing

- Nondisclosure of Grand Jury minutes

- Refusal to turn over witness notes after witness has testified

- Claims concerning use of informers to convict

- Constitutional errors in evidentiary rulings

- Instructions to the jury

- Claims of prejudicial statement by trial judges

- Claims of prejudicial statements by prosecutor

- Acquittal of co-defendant on same charge

- Defendant's absence from part of the proceedings

- Improper communications between prosecutor or witnesses and jury

- Question of actual guilt upon an acceptable guilty plea

## Asserted Grounds:

The Petitioner asserted the following *Losh* grounds:

- Involuntary guilty plea

8

- Mental competency at time of crime

- Mental competency at time of trial

- Incapacity to stand trial due to drug use

- Denial of counsel

- Consecutive sentences for same transaction

- Coerced confessions

- Unfulfilled plea bargains

- Ineffective assistance of counsel

- Claim of incompetence at time of offense, as opposed to time of trial

- Sufficiency of evidence

- Severer sentence than expected

- Excessive sentence

- Mistaken advice of counsel as to parole or probation eligibility

- Amount of time served on sentence, credit for time served (Home Confinement Time)

## D. THE STATE'S RESPONSE TO THE AMENDED PETITION AND MEMORANDUM IN SUPPORT THEREOF

On August 11, 2014, the Respondent, by and through Assistant Prosecutor McGinnis, filed a Response addressing the Petitioner's Amended Petition for Writ of Habeas Corpus. This pleading specifically answered most of the allegations raised by the Petitioner, and is set out in III.c., *infra.*

## E. THE OMNIBUS HABEAS CORPUS HEARING

On August 13, 2014, the Court conducted the omnibus habeas corpus proceeding in this action. The Petitioner appeared in person, and by counsel, Paul R. Cassell,

Esq. The State of West Virginia was represented by John McGinnis, Esq., Assistant Prosecuting Attorney. The Petitioner was sworn and the Court reviewed his rights in an omnibus habeas corpus proceeding. The Petitioner was advised that he had to raise all grounds in the Petition or be forever barred from raising the same, absent those special exceptions set forth, *infra*. The Petitioner stated that he was not under the influence of alcohol or drugs at the time of the hearing. The Court reviewed the *Losh* checklist with the Petitioner in detail and was advised that every ground that he wished to raise was before the Court in this proceeding.

The Petitioner testified on his own behalf. All parties agreed that the entire criminal file could be introduced into this habeas proceeding. The Petitioner stated that he was currently serving an effective sentence of five of five (5) to thirty-six (36) years for the charges raised in this habeas corpus matter. He was represented at the time of his plea by Phillip Ball, Esq. The Petitioner believes that he received ineffective assistance of counsel. He stated that he met with his attorney three or four times and that he waived indictment pled to an information. He was originally sentenced to five (5) to thirty-six (36) years in the penitentiary, which was suspended for probation. He was unable to successfully complete probation because he had some drug issues, failed a drug test, and was charged with additional crimes.

The Petitioner stated that he was an intravenous Dilaudid user and could not think clearly. He stated that he was using drugs on a daily basis. The Petitioner advised his trial attorney that he had a drug problem, but was never evaluated to determine if he was competent to make decisions regarding his case. He stated that he had been using drugs daily for about forty (40) years and was using drugs when he signed the

10

Waiver of Indictment and before his plea. He stated that he was using drugs on the day of his plea before Judge Aboulhosn. He admitted that Judge Aboulhosn asked him if he was using drugs, but did not tell him the truth because he was a drug addict.

After his probation was revoked he asked his attorney to file a reconsideration, but his lawyer told him there was no reason to do that.

The Petitioner also alleged that the statement he gave to the police was coerced in that the police told him that if he gave them a statement they would help get him out on bond. He was under the influence of drugs at the time he gave his statement. He was questioned by West Virginia State Troopers Christian and Long. Trooper Christian did not read him his Miranda rights, but Trooper Long did earlier in the day.

The Petitioner did not feel that Mr. Ball conducted an adequate investigation into what was going on in the charges. This was in part based on his belief that he thought he could get a better deal. He wanted to see the Motion for Discovery and was told that he wouldn't be able to see it. He never reviewed the discovery with his trial counsel.

The Petitioner believed that Trooper long had a "conflict of interest" in investigating this case because his mother worked at a day care center where Trooper Long was on the Board of Directors.

Before this case, the Petitioner did not have a criminal record and has a lot of family support. He had some other things going on in his life that he considered to be extenuating circumstances at the time of his crime, namely, his extensive drug use, the loss of his partner, and some medical issues. He was hospitalized for depression right around the time of his arrest. He has sought additional treatment for drug abuse.

11

The Petitioner testified that he was not receiving his legal mail; that he did not get proper access to the law library and filed several grievances; that he was denied personal hygiene products, adequate recreation, and the opportunity to attend religious services. He further was denied medical and mental health treatment that he believes he needed. This has occurred at the Eastern Regional Jail and at the Stevens Correctional Facility.

The Petitioner went through the *Losh* checklist stating that he based his involuntary guilty plea on his claim that he was using drugs at the time of the plea and that he was not fully informed of the charges. He also stated that he was mentally incompetent at the time of the crime and mentally incompetent at the time of his plea because of drug use.

The Petitioner further asserted that he was denied the right to counsel at the time of his interrogation. The Petitioner also believed that he received consecutive sentences for the same transaction. He maintained that his confession was coerced because he was under the influence of drugs when that he gave it.

He stated that his plea bargain was unfulfilled because he was under the impression that the sentences would run concurrent. That was based on his conversation with his trial counsel, although he understood there was a possibility that the judge could run the sentences consecutively. He stated the evidence was insufficient because he just did not know what the evidence was against him. He also believed that he received an excessive sentence because he had no prior criminal record, had family support, suffered from drug issues, and had personal problems at the time of his crime. Because he received consecutive sentences, he was eligible for

12

probation far later than he believed he would be. He also thought he should get additional credit for time spent on home confinement. He asked the court to run some of his sentences concurrent or may even reinstate probation.

On cross examination he stated that he was on IV drugs so bad that he did not know what he was doing at the time of the plea, but he remembered taking drugs that day. He stated that he lied to Judge Aboulhosn when asked if he had taken any drugs on his plea date. He stated that while he had three (3) or four (4) meetings with his trial counsel, they never reviewed the evidence. All the lawyer did was basically explain the plea. He does not remember the Court asking him if he understood what the State's case was against him.

On cross examination he admitted that his problem with his trial counsel was that he didn't get a good enough plea. He admitted that he was initially placed on probation. He does not remember Judge Aboulhosn telling him that he would waive his right to contest the voluntariness of his statement if he entered a plea. All he remembered about the hearing was a bunch of questions being asked.

On examination by the Court, he stated that there were originally twelve (12) felonies against him and that he was allowed to plead guilty to five (5) of them. The day he plead guilty before Judge Aboulhosn he didn't know what he was doing and doesn't remember anything about the plea. Upon further reflection, he stated that he didn't have specific recollection of using drugs that day, but he assumed he did since he was using them at the time.

He admitted that after the case was transferred from Judge Aboulhosn to the undersigned Judge, the undersigned Judge allowed him to stay on bond. Even though

13

his tests were negative at the time, he stated that it's because the drugs only lasted in his system for twenty-four (24) hours. Senior State Judge Knight, appearing while the undersigned Judge was presiding in another matter, placed the Petitioner in the Legends treatment facility. He was discharged from Legends on a technicality. He was still allowed to remain on probation while the Court, the Day Report Center and the Probation Department attempted to work with him for his substance abuse problems. He stated that he had been using drugs the entire time, even though he had been tested forty-five (45) times with no finding of drug use, but he was never caught because he was lying to the Court and to his probation officer throughout this period. He admitted that his probation was finally revoked when he tested positive for various drugs and was arrested on new charges. Those charges were dropped and basically he was sentenced for five (5) felonies in lieu of the fourteen (14) that he was charged with. He admitted that two of his family members were convicted felons.

The Petitioner next called his mother, Bonnie Franklin, to testify on his behalf. Ms. Franklin said that she went to some of the meetings with Mr. Ball on maybe two or three occasions, but that most of the time Mr. Ball was talking to him he was in jail. She stated that her son had mental health issues while he was incarcerated and that he wants to come home. She had no clue at the beginning that he was using drugs.

The Petitioner's final witness was his trial counsel, Phillip Ball, Esq. Mr. Ball stated that he was the Petitioner's trial attorney. He stated that the Petitioner had a great number of felonies and some other issues that had come up with a second group of felonies, including a drug charge and he was able to negotiate an all-encompassing

14

plea by information to resolve all the issues. He knew that Mr. Franklin had a drug history, but he did not believe he was doing drugs when he filled out the paperwork and was in Mr. Ball's office. He never saw any signs of him being on drugs during the course of his representation. Mr. Ball testified that he received discovery from the State and reviewed it with the Petitioner. His memory was that he also provided him a copy of the discovery. There were multiple reports from multiple agencies, including the Princeton Police Department and the West Virginia State Police. He stated that he reviewed the reports with the Petitioner, advised him of what was alleged and provided him with copies. That was his standard practice.

He also investigated the question of the confession. The police questioned him on one charge and then transported him to the Southern Regional Jail. As they were transporting him to the jail he began to voluntarily tell the police about other things that he had done. The Petitioner waived the attorney-client privilege for the purpose of this hearing so that Mr. Ball could testify. Based on what The Petitioner told him, Mr. Ball saw no reason to question the voluntariness of the confession when he stated that there was an initial interview discussion with the police at the State Police Detachment and that the major confession occurred when the Petitioner voluntarily discussed what he had done as he was being transported to jail.

To investigate this case, Mr. Ball spoke with the officers in charge, two (2) of the victims to learn what was stolen, the co-defendants attorney to see if he would be testifying against the Petitioner, and went over all the evidence presented. He investigated those matters that he felt needed to be investigated. He did not file any motions to suppress and did not file a motion for reconsideration.

15

On cross examination Mr. Ball stated that he met with the Petitioner several times at his office, at the jail, and at hearings. His recollection was that he met with Mr. Franklin ten (10) to twenty (20) times and that would be in his bill. During the meetings, the Petitioner appropriately answered questions, and there was nothing in his demeanor in any of the meeting that would make counsel question the Petitioner's competency. There was nothing that took place during the plea hearing that would make him believe the Petitioner was under the influence. He believed that the Petitioner appropriately answered all the questions asked him during the plea hearing.

On examination by the Court, Mr. Ball stated that he had negotiated at least twelve (12) felony charges down to five (5) felony charges for which the Petitioner was originally probated and subsequently returned to probation on several occasions before finally being arrested on two (s) more felonies for which he was not prosecuted. This ultimately led to him being sent to the penitentiary.

The Court reviewed the Defendant's Statement In Support of Guilty Plea where the Petitioner stated that he was not under the influence of any drug or alcohol or other stimulants while completing the questionnaire, and that he had not taken alcohol or any medication, drugs of any kind within the previous twenty-four (24) hours.

Mr. Ball had fifteen (15) years of experience as an attorney at the time of this plea and had also served as an Assistant Prosecuting Attorney during his career. When asked if he had anything that would cause him as an officer of the Court to believe that the Petitioner needed evaluation for his competency to stand trial, ability to cooperate with his attorney, or his criminal responsibility, he answered "no he was very cooperative and very intelligent. He has a college degree if I remember

16

correctly, very intelligent, we discussed everything fully." The record was complete at the conclusion of the hearing.

## III.   DISCUSSION

### A.   HABEAS CORPUS DEFINED

Habeas Corpus is a "suit wherein probable cause therefore being shown a writ is issued which challenges the right of one to hold another in custody or restraint." Syl. Pt. 1. *State ex rel. Crupe v. Yardley*, 213 W. Va. 335, 582 S.E.2d 782 (2003). The issue presented in a Habeas Corpus proceeding is "whether he is restrained of his liberty by due process of law." *Id. At* Syl. Pt. 2. "A Habeas Corpus petition is not a substitute for writ of error[1] in that ordinary trial error not involving constitutional violations will not be reviewed." *Id. At* Syl. Pt. 3.

### B.   THE AVAILABILITY OF HABEAS CORPUS RELIEF

In *State ex rel. McCabe v. Seifert*, the West Virginia Supreme Court of Appeals delineated the circumstances under which a post-conviction Habeas Corpus hearing is available, as follows:

(1)     Any person convicted of a crime and

(2)     Incarcerated under sentence of imprisonment therefore who contends

(3)     That there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both, or

(4)     That the court was without jurisdiction to impose the sentence, or

---

[1] A writ of error issued by an appellate court to the court of record where a case was tried, requiring that the record of the trial be sent to the appellate court for examination of alleged errors.

17

(5)    That the sentence exceeds the maximum authorized by law, or

(6)    That the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common-law or any statutory provision of this State, may without paying a filing fee, file a petition for a writ of Habeas Corpus Ad Subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief. 220 W. Va. 79 640 S.E.2d 142 (2006); W. Va. Code §53-4A-1(a)(1967)(Repl. Vol. 2000).

Our post-conviction Habeas Corpus statute, W. Va. Code §53-4A-1 *et seq.*, "clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction Habeas Corpus proceeding during which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover." Syl. Pt. 1, *Gibson v. Dale*, 173 W. Va. 681, 319 S.E.2d 806 (1984). At subsequent Habeas Corpus hearings, any grounds raised at a prior Habeas Corpus hearing are considered fully adjudicated and need not be addressed by the Court. *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

Yet, some limited exceptions apply to this general rule: "[a] prior omnibus Habeas Corpus hearing is *res judicata* as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however an applicant may still petition the court on the following grounds: (1) ineffective assistance of counsel at the omnibus Habeas Corpus hearing; (2) newly discovered evidence; (3) or, a change in the law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).[2]

---

[2] On June 16, 2006, the West Virginia Supreme Court of Appeals held that a fourth ground for Habeas relief may exist in cases involving testimony regarding serology evidence. To summarize, the Court held as follows:
    A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime serologist, other than a serologist previously found to have engaged in intentional misconduct, offered evidence may bring a petition for writ of Habeas Corpus based on the

18

A Habeas Corpus proceeding is civil in nature. "The general standard of proof in civil cases is preponderance of the evidence." *Sharon B.W. v. George B.W.*, 203 W. Va. 300, 303, 507 S.E.2d 401, 404 (1998).

The West Virginia Supreme Court of Appeals has articulated the way for a Circuit Court to review Habeas Corpus petitions: "Whether denying or granting a petition for a writ of Habeas Corpus, the circuit court must make adequate findings of facts and conclusions of law relating to each contention advanced by the petitioner, and state the grounds upon which the matter was determined." *Coleman v. Painter*, 215 W. Va. 592, 600 S.E.2d 304 (2004).

## C. FINAL LIST OF GROUNDS ASSERTED FOR ISSUANCE OF A WRIT OF HABEAS CORPUS, AND THE COURT'S RULINGS THEREON

The Court has carefully reviewed all of the pleadings filed in this action, the transcripts of the omnibus hearing, the Court files in the underlying criminal action, the transcripts of the plea hearing, and the applicable case law. The Court has also reviewed the *Losh* checklist filed by the Petitioner with his Amended Petition for Writ of habeas Corpus.

The matters before this Court for review are:

1. Whether trial counsel was ineffective on the following grounds:

   a. Failure to file a Rule 35 reconsideration.

   b. Failure to make an adequate investigation concerning the legality of the Petitioner's confessions, given concerns about the Petitioner's request for

---

serology evidence even if the prisoner brought a prior Habeas Corpus challenge to the same serology evidence and the challenge was finally adjudicated.
*In re Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 633 S.E.2d 762, 219 W. Va. 408 (2006).

19

counsel, whether the statement was coerced by promises with regards to bond or the Petitioner's drug use, and whether the Petitioner's *Miranda* rights were otherwise violated when he was questioned by a second officer with regard to being read his *Miranda* rights again.

    c.  Failure to conduct an adequate investigation

    d.  Failure to investigate a conflict of interest involving Trooper Long.

    e.  Failure to make an adequate investigation regarding the plea bargain.

2.  Whether the Petitioner's guilty plea was knowingly, voluntarily, and intelligently made.

3.  Whether the Petitioner received a disproportionate sentence.

4.  Whether the Petitioner's Federal and State Constitutional Rights were violated by the Cumulative Effect of the Errors cited herein.

5.  Whether the Petitioner is being subjected to cruel and unusual punishment.

6.  Whether the other matters raised by the Petitioner have merit.

The other issues raised in the Petitioner's *Losh* checklist are subsumed in the above referenced matters, and are addressed, *supra*.

## 1. WAS COUNSEL INEFFECTIVE?

### a. The Petitioner's Argument

The West Virginia Supreme Court has recognized that the Sixth Amendment to the Constitution of the United States and Article 3, Section 14 of the Constitution of West Virginia mandates that a Defendant, in a criminal proceeding receive "competent and effective assistance of counsel." *State ex. Rel. Strogen v. Trent*, 469 S.E.2d 7, 9-10 (W.Va. 1996) (numerous citations omitted).

20

According to the Supreme Court, claims of ineffective assistance of counsel are to be governed by the two prong test established by the United States Supreme Court in *Strickland v. Washington,* 466 US 668 (1984): (1) counsel's performance was deficient under an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 12. The West Virginia Supreme Court has established that in reviewing counsel's performance, Courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. *Id.* "Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." *Id.* (citations omitted).

Importantly, the West Virginia Supreme Court has recognized, just as the United States Supreme Court recognized earlier, that any presumption that counsel's conduct does fall within the range of reasonable professional assistance does not apply where counsel's strategic decisions are made after an inadequate investigation. *State ex rel. Vernatter v. Warden,* 528 S.E. 2d 207, 213 (W. Va. 1999), citing *State ex. Rel. Daniel v. Legursky,* 465 S.E. 2d 416, 422 (W. Va. 1995).

The Court has stated that "counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *State ex. Rel. Daniel v. Legursky,* 465 S.E. 2d 416, 422 (W. Va. 1995).

The Court has stated that "counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary."

21

*State ex. Rel. Daniel v. Legursky,* 465 S.E. 2d 416, 422 (W. Va. 1995). The West Virginia Supreme Court has recognized that in applying the standard, "courts ... have found no difficulty finding ineffective assistance of counsel where an attorney neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so." *Id.* at 422.

The United States Supreme Court has recently confirmed the crucial role of the plea bargaining process and the constitutional entitlement to effective assistance of counsel in that process. *Missiouri v. Frye,* 132 S. Ct. 1399, 182 L. Ed. 2d 379, 80 U.S.L.W. 4253 (2012); *Lafler v. Cooper,* 132 S. Ct. 1376, 182 l. Ed. 2d 398, 80 U.S.L.W. 4244 (2012).

In the case at bar, trial counsel was ineffective in numerous ways. First, despite a request to do so, no Rule 35 motion was filed after defendant was sentenced to consecutive terms of incarceration totaling 5-36 years. Second, trial counsel conducted an inadequate investigation concerning the legality of defendant's confessions. Specifically counsel failed to ensure that the confessions were properly admissible into evidence given concerns about the (1) defendant's request for counsel, (2) that the confession was coerced by promises with regards to bond or defendant's drug use, or (3) that defendant's *Miranda* rights were otherwise violated when he was questioned by a second officer without being read his *Miranda* rights again. Third, with regard to the underlying trial and probation violation, that trial counsel conducted an inadequate investigation. Fourth, that trial counsel failed to properly investigate a possible conflict of interest arising from Trooper Long (the investigating officer) supervising the defendant's mother by serving on a board

overseeing her work as the director of Mother Goose Child Day Care Center. Fifth, and finally, counsel's inadequate investigation made trial counsel ineffective in making recommendations regarding plea bargaining.

**b.   The State's Response**

The State disputes the Petitioner's contention that his trial counsel was ineffective. The Petitioner states that his trial counsel did not conduct a reasonable investigation prior to allowing the Petitioner to take a plea. The Petitioner further contends that the lack of investigation means that his plea was not knowingly, intelligently and voluntarily made. However, the State does not see how the Petitioner's plea could have been entered under such circumstances. The Court will not accept a plea until it is satisfied that trial counsel has conducted an investigation and that the Defendant has been adequately informed of the facts and the law of the case. Furthermore, the Court always asks the Defendant if his counsel's statements are true and the Defendant must agree. The Court than asks the Defendant if he needs more time to consult with his attorney before entering his plea. The Court will not accept the plea until the Court is satisfied that the Defendant and attorney have answered all questions appropriately and that the plea is being knowingly and voluntarily made. Therefore, the State feels confident that the Petitioner received effective assistance of counsel prior to entering his plea.

The Petitioner further contends that his trial counsel was ineffective because he failed to file a Rule 35 Motion after the Petitioner was sentenced to the penitentiary. However, the State also disputes this contention. The State argues that both prongs of *Strickland* cannot be met in the present case. Even if trial counsel was deficient, it is

23

highly unlikely that results would have been different. The Petitioner had already had his probation revoked. Therefore, it is highly unlikely that the Court would have seen fit to reconsider his sentence and place him back on probation.

c. **Findings of Fact and Conclusions of Law:**

The Court makes the following specific finding of fact and conclusions of law regarding the Petitioner's claim of Ineffective Assistance of Counsel:

(1) The Court **FINDS** that the West Virginia Supreme Court of Appeals stated the test to be applied in determining whether counsel was effective in *State v. Miller:*

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 764 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995), syl. pt. 5.

(2) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

> Where counsel's performance attacked as ineffective arises from occurrence involving strategy, tactics, and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of the accused. *State ex rel Humphries v. McBride,* 220 W.Va. 362, 645 S.E.2d 798 (2007) syl. pt. 5. In accord, Syllabus point 21, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974).

24

(3) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

> [i]n reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstance, the identified acts omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995) syl. pt. 6.

(4) The Court **FINDS** that on the issue of competency to stand trial, the West Virginia Supreme Court of Appeals held in *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 433 (1976), that:

> No person may be subjected to trial on a criminal charge when, by virtue of mental incapacity, the person is unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him. Syl. Pt. 1

(5) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

> It is a fundamental guarantee of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent. *State v. Hatfield*, 186 W.Va. 507, 413 S.E.2d 162 (1991), Syl. Pt. 6, following *State v. Cheshire*, 170 W.Va. 217, 292 S.E.2d 628 (1982). Syl. Pt. 1

(6) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

25

When a trial judge is made aware of possible problem with defendant's competency, it is abuse of discretion to deny a motion for a psychiatric evaluation. *State v. Hatfield*, supra at Syl. Pt. 2, citing Syl. Pt. 4, in part, *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980).

(7) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held in *State v. Sanders*, 209 W.Va. 367, 549 S.E.2d 40 (2001):

Importantly, since the right not to be tried while mentally incompetent is subject to neither waiver nor forfeiture, a trial court is not relieved of its objection to provide procedures sufficient to protect against the trial of an incompetent defendant merely because no formal request for such has been put forward by the parties . . . In other words, a trial court has an affirmative duty to employ adequate procedures for determining competency once the issue has come to the attention of the Court, whether through formal motion by one of the parties or as a result of information that becomes available in the cause of criminal proceedings.

(8) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also confirmed its process for determining whether a broad inquiry into a defendant's mental competency is constitutionally required in *Sanders*:

Evidence of irrational behavior, a history of mental illness or behavioral abnormalities, previous confinement for mental disturbance, demeanor before the trial judge, psychiatric and lay testimony bearing on the issue of competency, and documented proof of mental disturbance are all factors which a trial judge may consider in the proper exercise of his (or her) discretion (to order an inquiry into the mental incompetence of a criminal defendant.) *Sanders*, Syl. Pt. 6, following

26

Syl. Pt. 5, *State v. Arnold*, 159 W.Va. 158, 219 S.E.2d 922 (1975).

(9) The Court **FINDS** that the West Virginia Supreme Court of Appeals also held in *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976) that:

> "When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law, and it is error for the trial court to give an instruction on the issue of insanity which imposes a different test or which is not governed by the evidence presented in the case."

(10) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held, as to the burden of proof when a criminal defendant claims lack of criminal responsibility that:

> "There exists in the trial of an accused a presumption of sanity. However, should the accused offer evidence that he was insane, the presumption of sanity disappears and the burden of proof is one the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense." Syl. Pt. 2, *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979).

(11) The Court **FINDS** that on the issue of ineffective assistance of counsel the Petitioner gave the following testimony at the omnibus habeas corpus hearing:

Q And do you have some - - do you have some complaints about the effectiveness of your - - the assistance of your counsel in that case?

A Yes, I do.

27

Q Let's start talking about that. Did you - - how often did you meet with your counsel concerning this - - these charges?

A How often did I what? What was that again?

Q How often did you meet with your attorney concerning these charges?

A I want to say about three or four times.

(*See* Omnibus Habeas Corpus Transcript at p. 9, L:20 – p. 10, L:7)

(12)    The Court **FINDS** that on the issue of ineffective assistance of counsel the Petitioner further testified at the omnibus habeas corpus hearing:

Q Ineffective assistance of counsel, we've talked about that with regard to the investigation with regard to the issues relating to your drug use. Is that - -

A Yes.

Q Is that why you raised that grounds?

A Yes.

(*See* Omnibus Habeas Corpus Transcript at p. 27, L:14 – 20)

(13)    The Court **FINDS** that the Petitioner testified about his drug use at the omnibus habeas corpus hearing as follows:

Q All right. Now did you advise your lawyer of your drug problems?

A Yes.

Q And were you ever evaluated to determine if you were competent to make decisions regarding your case?

A No.

Q During the course of time leading up to your arrest for the probation violation, you testified you were using drugs daily. Is that right?

A Yes.

Q How long had you been using drugs daily?

A I'm going to say about forty years.

Q So at the time of September , 2011, when you did the Waiver of the Indictment and prior to your plea on October 7th, 2011, were you using drugs?

A Yes.

Q Were you using drugs on the day of the hearing?

A What date was that again?

Q October 7th, 2011, I think was the date of the actual plea hearing.

A Yes.

Q Do you remember going to the plea hearing?

A Yes.

Q Now the judge asked you if you'd taken any controlled substance that day. Did you tell him the truth?

A No.

Q Why didn't you?

A I was a drug addict.

(*See* Omnibus Habeas Corpus Transcript at p. 12, L:15 – p. 13, L:22)

(14)     The Court **FINDS** that the Petitioner testified about his involuntary confession at the omnibus habeas corpus hearing as follows:

Q Now with regard to your - - with regard to your original charge - - charges, did you give a statement to the police?

A Yes, I did.

Q Tell us how that statement came to be given.

A I was told that if I gave a statement they would help me get out of -- they would help me get bond.

Q At the time of giving your statement, wre (sic) you -- had you been using drugs?

A Yes.

Q When had you used drugs that day? Do you remember?

A All day.

Q All the same day?

A Yes.

Q Which officer promised you that he would help you with bond if you gave a statement?

A I believe it was Lieutenant Christian, which is the officer that transported me to the magistrate office.

Q No were you -- were you interrogated or questioned by more than one officer?

A Yes.

Q Who was the other officer that questioned you?

A Officer Long.

Q All right. These are both troopers with the West Virginia State Police?

A Yes.

Q Now did Trooper Christian read you your Miranda rights? Do you remember that?

30

A No.

Q Did Trooper Long?

A No. Yes. Yes. Earlier that day he did, but the other officer didn't.

Q All right. So you were read your Miranda rights earlier that day by Trooper Long and later Trooper Christian questioned you?

A Yes.

Q Did Trooper Christian advise you that you still had the same rights?

A No.

Q And were your admissions made with regard to talking to Trooper Christian?

A Yes.

(*See* Omnibus Habeas Corpus Transcript at p. 14, L:18 – p. 16, L:17)

(15) The Court **FINDS** that the Petitioner gave further testimony about his involuntary confession at the omnibus habeas corpus hearing as follows:

Q The denial of counsel, we didn't talk about that one. That's a good reason for us to go through there. When you were initially questioned in this case, did you ask for an attorney?

A Yes, I did. After being questioned for about two hours, I requested for an attorney and - -

Q Did the questioning cease at that point?

A No. They still asked a couple more questions and, which I refused to answer. And then later on that day they started doing the questions again while transporting me to the magistrate's office.

31

Q And is that when you made the confession?

A After that. Yes.

Q After you'd requested an attorney?

A Yes.

Q So is that the issue with regard to the denial of counsel?

A Yes.

(*See* Omnibus Habeas Corpus Transcript at p. 24, L:10 – p. 25, L:4)

(16) The Court **FINDS** that the Petitioner gave further testimony about his involuntary confession at the omnibus habeas corpus hearing as follows:

Q The coerced confession, again that's related to the fact that they told you that if you confessed you would get help on - - with regard to bond?

A Right. Yes.

Q And the other, of course, with regard to confession, you'd been using drugs that day.

A Yes.

Q Were you still under the influence of drugs at that time?

A Yes.

Q That you gave the confession?

A Yes.

Q And you'd also asked for counsel, for an attorney?

A Yes.

Q But they continued to question you?

A Yes.

32

(*See* Omnibus Habeas Corpus Transcript at p. 25, L:9 – p. 26, L:2)

(17) The Court **FINDS** that the Petitioner testified further about his involuntary confession at the omnibus habeas corpus hearing as follows:

Q Now with regard to the statement that you gave to these State Troopers, now you also state that you, you know, - - you were on drugs really bad that day, correct?

A Yes.

Q But yet you also remember all these facts of them asking you these questions and then you telling them you want a lawyer?

A Yes.

Q Okay. And isn't it true that during your plea hearing the judge also told you that by entering that plea you were waiving, or giving up those grounds, that by entering that plea you were giving up the right to assert those grounds?

A I don't remember. I remember some of the plea hearing but I mean, the whole thing, like - - when I'm on drugs I can't remember everything that happened.

(*See* Omnibus Habeas Corpus Transcript at p. 32, L:18 – p. 33, L:11)

(18) The Court **FINDS** that the Petitioner testified about his trial counsel's inadequate investigation at the omnibus habeas corpus hearing as follows:

Q With regard to the underlying charges, did you feel like your attorney had conducted an adequate investigation of what was going on in those charges?

A Absolutely not.

33

Q Okay Tell me why you believe that.

A When I went to speak to him about this plea, I asked him if there was any way that he thought - - well, I asked him for his advise (sic) on what we would - - if there was any way we could get a better plea, I didn't feel that that plea was fair. And it was the first plea. And my attorney, Phillip Ball, he advised me that the Prosecuting Attorney wasn't going to offer anything else. I asked to see the Motion of Discovery and was told I wouldn't be able to see that.

After filing for the paperwork through the Court, I noticed that he had already had the Motion of Discovery. So at that - - at this point I don't feel like he represented me to his fullest.

Q Did you ever review the discovery with Mr. Ball?

A No, I haven't.

Q I didn't hear you. I'm sorry.

A No, I haven't. I also requested those paperwork prior to filing this habeas and I still haven't got it.

(*See* Omnibus Habeas Corpus Transcript at p. 16, L:18 – 19)

(19)     The Court **FINDS** that the Petitioner testified about his mental competency at the omnibus habeas corpus hearing as follows:

Q Now as to the mental competency at the time of crime and mental competency at time of trial and incapacity to stand trial due to drug use, that's all related to the fact that you were an IV user of Diloted (sic)?

A Right. Yes.

34

(*See* Omnibus Habeas Corpus Transcript at p. 24, L:4 – 9)

(20)    The Court **FINDS** that the Petitioner testified about his mental competency at the omnibus habeas corpus hearing as follows:

Q Claim of incompetence at time of offense, as opposed to time of trial, is that related to your IV drug use?

A Yes

(*See* Omnibus Habeas Corpus Transcript at p. 27, L:21 – p. 28, L:1)

(21)    The Court **FINDS** the Petitioner's trial counsel testified about the adequacy of his representation of the Petitioner at the omnibus habeas corpus hearing:

Q Now you heard Mr. Franklin's complaints that you did not review the discovery with him. Did you receive discovery from the State?

A I did.

Q And did you review it with him?

A I did

Q Did you provide him with a copy of it?

A My memory is that I did, yes.

Q Was it the standard discovery that you receive, the police report?

A Whatever I had.

Q There were a number of charges. Were there multiple reports?

A Yes. From different agencies, Princeton Police, State Police.

Q And describe for the - - describe for the Court how you reviewed this with him, how that took place.

A We'd just sit and go through the reports, we'd discuss them, I'd tell him what they were alleging, and I provided copies. This happened two or three years ago, so.

Q Is that your standard practice or do you have a specific memory of doing that in this case?

A Well, it's a standard practice but I do remember going over the case work with Mr. Franklin.

(*See* Omnibus Habeas Corpus Transcript at p. 48, L:17 – p. 49, L:19)

(22)	The Court **FINDS** the Petitioner's trial counsel testified about his investigation of the Petitioner's case and his decision not to file a Rule 35 Motion at the omnibus habeas corpus hearing:

Q So describe for me the nature of your investigation of these charges. Did you - - you received the discovery packet, you testified. What else did you do?

A I spoke with the officers in charge. I spoke with two of the victims trying to inquire about what was stolen, what was not stolen at the time. I can't remember whether there were any witnesses. I know there was another co-joined case from the person he sold the tractor to. I spoke with that person's attorney as to what that defendant would be saying against Mr. Franklin and the possible outcome of all of that.

THE COURT: Excuse me. Hold on a second.

Go ahead. I'm sorry.

36

THE WITNESS: If my memory serves, I spoke to all the investigating officers, went over all the evidence that was presented and investigated it the way I felt best to investigate it.

BY MR. CASSELL:

Q Did you file any motions to suppress or any other motions?

A I don't believe I did, no. I don't believe I did. If they're not in the file, I did not.

Q And did you file a Rule 35 Motion after he was sentenced in the last sentencing?

A I don't believe I did, no.

Q And did the client request that you do that?

A I believe he did, yes.

Q And why didn't you file it?

A At the time - - I don't remember. Actually when you - - when this first came up and I was aware that Mr. Franklin was - - was filing this, I thought I had filed it. I really did. I went back and checked my file and evidentially I had not.

Q Is that something you would ordinarily do if requested to do so by a client?

A Yes.

Q And it would be standard practice for an attorney to do so - -

A Yes.

Q - - if requested to file it?

37

A Yes.

Q When Mr. Franklin was initially locked back up on his probation violation charge before he was actually sentenced on the probation violation, did he ask for advise (sic) about whether to cooperate with the police or not with regard to the new charges?

A I don't remember if he did or not off the top of my head. I know we discussed the new charges but - - and he always asked me about what, you know, was going on, you know. We had conversations and he always participated fully in those conversations. But did he actually ask me what he should do, my standard practice, you know, when he said he thought that - - before when he said he thought the judge would run them concurrent, I always tell my clients, always, that, you know, I believe the judge may do this or the State has agreed to do that, but you understand he could hammer you and put you one, you know - - consecutive, all of them. I always tell them the exact same thing.

(*See* Omnibus Habeas Corpus Transcript at p. 53, L:12 – p. 56, L:3)

(23)     The Court **FINDS** the Petitioner's trial counsel further testified as to the adequacy of his representation of the Petitioner at the omnibus habeas corpus hearing:

BY MR. MCGINNIS:

Q Now Mr. Ball, you say that Mr. Franklin met with you a few time (sic), three or four times maybe?

38

A I'd have to go through my bill. I didn't even think about that before I came over here. I met with Mr. Franklin several times, at my office, at the jail, at hearings. He said maybe four times at the preliminary hearings. His mother testified it was two or three times at the office and at the hearings. I bet it's ten to twenty times I met with Mr. Franklin, and it would be in my bill to the exact number.

Q Okay. Now during those times did he answer questions appropriately, ask appropriate questions?

A I thought so, yes.

Q Was there anything in his demeanor or in any of the meetings that you had that made you question his competency?

A No.

Q Now you were present for his plea hearing, correct?

A Yes.

Q Now do you remember that plea hearing?

A Vaguely, yes.

Q Somewhat. To your recollection, did he appear to be under the influence at all?

A No.

Q Now the plea hearing itself, is this the standard plea hearing that we have all sat through as criminal attorneys where all the Constitutional Rights are explained and the Defendant and the attorney are questioned as to the case?

A Yes.

39

Q Okay. And to your recollection did Mr. Franklin answer appropriately to all those questions?

A Yes, he did.

(*See* Omnibus Habeas Corpus Transcript at p. 56, L:12 – p. 57, L:23)

(24)    The Court **FINDS** that the Petitioner's trial counsel testified at the omnibus habeas corpus hearing on the allegations concerning the Petitioner's alleged drug use as follows:

Q Were you aware of Mr. Franklin's extensive drug use?

A I knew he had a drug history. I don't believe I would have thought he was doing drugs at the time. And I know I didn't think he was doing drugs when he filled out the paperwork and was in my office.

Q Did you ever see any signs of him being on drugs during the course of your representation?

A No.

(*See* Omnibus Habeas Corpus Transcript at p. 48, L:8 – 16)

(25)    The Court **FINDS** the Petitioner's trial counsel testified as follows at the omnibus habeas corpus hearing on the issue of the voluntariness of the Petitioner's confession:

Q Now did he discuss with you this issue regarding confession?

A Yes, actually. That, and I also, you know, - - I spoke with the police officer in question along with some other police officer and the prosecuting attorney at the time.

My memory of what transpired is, they brought William in for questioning on one count, one charge. If I remember correctly it was for stealing the tractor from Conn's. But they - - they basically questioned him on that one charge. And then after they were finished questioning him they were transporting him over to Regional Jail and both Mr. Franklin and the State Police Officer both told me the same story. He was sitting in the back of the car and just started telling them, you know, let me tell you - -

THE COURT: Let me - - - - Mr. Ball, they've asked you some questions that are within the attorney/client privilege.

So is your client allowing him then to break the attorney/client privilege?

MR. CASSELL: We're asserting ineffective assistance of counsel. We've (sic) waiving the attorney/client privilege.

THE COURT: Do you understand that, Mr. Franklin? Whatever you're (sic) told your attorney is between you and him. But now that you've questioned this, he, you know, - - he has a right to answer these questions and tell the truth. So I mean, we have to have - - are you giving up your right to - - or rather your attorney/client privilege?

THE PETITIONER: Yes, sir.

THE COURT: All right. Go ahead, Mr. Ball.

THE WITNESS: Thank you.

BY MR. CASSELL:

Q I'm sorry. We were discussing the confession issue.

THE COURT: You were going to - -

41

THE WITNESS: Mr. Franklin was in the backseat of the cruise, he was hauling him over to Southern Regional Jail and Mr. Franklin just voluntarily said, you know, "I've got some other stuff I want to tell you" and layed out - - at that time they only had him on I want to say one, maybe two counts, and he just started laying out the case, you know, and just - - I think he admitted to - - I was thinking there was more like nineteen charges. But just admitted it to the police officer. Mr. Franklin told me that and the police officer told me that. So there was not reason to question the admission?

BY MR. CASSELL:

Q He didn't tell you about the second officer questioning him?

A Where? I didn't understand that from his testimony.

Q All right. Mr. Franklin - - and I'll represent that was the testimony. You were present in the courtroom, too.

A Right.

Q But the way I remember Mr. Franklin's testimony he said he was initially questioned by Trooper Long and read his Miranda rights and then thereafter while he was being transported he was subsequently questioned and that's when the major confession occurred. Is that consistent with the information you developed in your investigation?

A Well, the information I developed was there was an initial interview discussion with the police officers and I think that happened at the State Police Detachment.

42

Once they had finished that interview then the - - what Mr. Franklin - -

you were presenting as a second interview where he confessed to the major

counts was not an actual interview. He was just being transported to the State

Police - - or the Southern Regional Jail and he just voluntarily started talking.

And Mr. Franklin told me that and the State Police told me that.

(*See* Omnibus Habeas Corpus Transcript at p. 49, L:20 – p. 53, L:5)

(26)    The Court **FINDS** the Petitioner's trial counsel testified om the issue of

the Petitioner's competency at the time of the plea as follows:

THE COURT: And I'm reading his questionnaire now. It says, "Are

you," - - this is from Defendant's Statement in Support of Guilty Plea. Did you

go over this with him?

THE WITNESS: Yes, Your Honor.

THE COURT: It says, "Are you now under the care of any physician for

any physical or mental disorder?"

He said, "Yes."

"Have you been under the influence of any drug or alcohol or other

stimulates (sic) while completing this questionnaire?"

"No."

"Have you taken or consumed any alcohol or any medicine or drug of any

kind within the previous twenty-four house?"

"No."

Do you remember all that?

THE WITNESS: Yes, Your Honor.

THE COURT: And you have - - how many years you been practicing law now?

THE WITNESS: Eighteen.

THE COURT: And so at the time you did this, this was what, 2011, you would have been practicing fifteen years. Right?

THE WITNESS: Approximately, yes, Your Honor.

THE COURT: Doing criminal - - you were an Assistant Prosecutor as well, too, as well as defense. Right?

THE WITNESS: Correct.

THE COURT: Did you have anything that would cause you as an officer of the Court to in any way, shape or form believe that he needed an evaluation for either A.) Competency to stand trial, ability to cooperate with attorney or, you know, anything about criminal responsibility in any way, shape or form that would cause you to do that?

THE WITNESS: No, Your Honor. He was very cooperative and very intelligent. He's got a college degree, if I remember correctly, very intelligent. We discussed everything fully.

(*See* Omnibus Habeas Corpus Transcript at p. 59, L:10 – p. 61, L:4)

(27)     The Court **FINDS** that the trial court addressed trial counsel's representation of the Petitioner during the plea colloquy:

THE COURT: Counsel, can you outline to the Court how many conferences you've had with your client, to what extent

44

you've gone over with him this matter and his constitutional rights, and if you're satisfied with the State's disclosures in this case?

MR. BALL: Your Honor, I've personally spoke with Mr. Franklin approximately ten times regarding the various charges, herein. Concerning the plea itself, probably three or four times in detail about the various pleas and negotiation up to the plea. As regard his rights, we've probably met twice; once when we went over the forms where we specifically went through every form. We talked about the burden of proof, and the waiver of the indictment and the information to be filed against him.

I think that Mr. Franklin is well aware of his rights and ready to proceed forward in this matter, and I am satisfied with the State's disclosures regarding all the cases pending against him.

THE COURT: Okay. You heard what your attorney just said, Mr. Franklin., do you agree with what he said?

THE DEFENDANT: Yes, sir.

(*See* Plea Hearing Transcript at p. 17, L:11 – p. 18, L:11)

(28)    The Court **FINDS** that the trial counsel addressed the Petitioner's waiver of his right to contest the voluntariness of his confession:

45

THE COURT: Do you understand that you have the right to ask this Court to suppress any illegally obtained evidence or confession? That means any evidence or confession that was obtained contrary to the law or your constitutional rights couldn't be used against you and would actually be thrown out. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you know that you have the right to challenge in this court and on appeal any errors in any pretrial proceedings?

THE DEFENDANT: Yes, sir.

THE COURT: Do you know that if you plead guilty that you're giving up all the rights I've just explained to you, and that you would be giving up your right to a trial?

THE DEFENDANT: Yes, sir.

THE COURT: Do you know and understand that by entering a plea of guilty you waive any and all pretrial defects with regard to your arrest, the gathering of evidence, prior confessions, and further that by pleading guilty you waive all non-jurisdictional defects in the court proceedings against you?

THE DEFENDANT: Yes, sir.

(*See* Plea Hearing Transcript at p. 24, L:17 – p. 25, L:17)

46

(29)     The Court **FINDS** that the trial court specifically addressed the issue of whether the Petitioner was under the influence of drugs or alcohol at the time of his plea:

THE COURT: Now, we talked earlier, you have - - you don't have any history of mental illness, but you do have an appointment coming up to be checked for that. Is that correct?

THE DEFENDANT: Yes.

THE COURT: And you admit that you're addicted to drugs or alcohol, and you're not currently under the influence of any drugs or alcohol or any prescription medication that affects your ability to understand what's going on here today. Is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: I'm sorry?

THE DEFENDANT: Yes, sir.

(*See* Plea Hearing Transcript at p. 26, L:15 – p. 27, L:4)

(30)     The Court **FINDS** that the trial court addressed the Petitioner as to his satisfaction with his trial counsel's representation:

THE COURT: Mr. Franklin, are you satisfied with the manner in which your attorney has represented you in this case?

THE DEFENDANT: Yes, sir.

THE COURT: Do you think that there's anything that your attorney has failed to do in representing you?

THE DEFENDANT: No, sir.

THE COURT: Did he do anything that you didn't want him to do in your case?

THE DEFENDANT: Yes. I'm sorry.

THE COURT: No. The question is did he do anything that you did not want him to do in your case? Did he do something you didn't want him to do?

THE DEFENDANT: No.

THE COURT: Okay. Do you have any complaints at all about your attorney or the manner in which your attorney has represented you in this case?     .   .

THE DEFENDANT: Do what?

THE COURT: Do you have any complaints about your attorney or the manner in which your attorney has represented you in this case?

THE DEFENDANT: No, sir.

(*See* Plea Hearing Transcript at p. 39, L:1 – 23)

(31)     The Court **FINDS** that the Petitioner informed the trial court that he was giving truthful answers to all questions asked during the plea hearing:

THE COURT: Have you understood all of my questions?

48

THE DEFENDANT: Yes, sir.

THE COURT: Have all of your answers been truthful?

THE DEFENDANT: Yes, sir.

(*See* Plea Hearing Transcript at p. 39, L:24 – p. 40, L:5)

(32) The Court **FINDS** that the trial court specifically asked the Petitioner if he had used any narcotic drugs before the plea:

Mr. Franklin, state your full name for me, please.

THE DEFENDANT: William Franklin - - William David Franklin II.

THE COURT: And how old are you?

THE DEFENDANT: Twenty-six.

THE COURT: Okay. How far did you go in school?

THE DEFENDANT: Some college.

THE COURT: So you graduated high school.

THE DEFENDANT: Yes, sir.

THE COURT: And you went to some college.

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Now, do you currently have a job?

THE DEFENDANT: No, sir.

THE COURT: All right. Are you under the care of a physician at this time?

THE DEFENDANT: Huh?

49

THE COURT: Are you under the care of a physician at this time?

THE DEFENDANT: Yeah. Yes, sir.

THE COURT: What about a psychiatrist?

THE DEFENDANT: I start going August the 3rd. They're going to do a psychological evaluation - -

THE COURT: You mean October 3rd?

THE DEFENDANT: I mean October 3rd, I'm sorry. Yes, sir.

THE COURT: Okay. Are you being treated, or have you been treated for alcohol or narcotic addiction?

THE DEFENDANT: I have been in treatment.

THE COURT: Okay. Are you presently on any kind of medication?

THE DEFENDANT: I'm on Atripla.

THE COURT: I'm sorry?

THE DEFENDANT: Atripla.

THE COURT: Atripla?

THE DEFENDANT: Yeah.

THE COURT: You've got to speak up for me - -

THE DEFENDANT: Okay. I'm sorry.

THE COURT: - - William, so I can hear you, and so the court reporter can take everything down, as well.

50

Have you used any narcotic drug in the last 24 to 48 hours?

THE DEFENDANT: No.

(*See* Plea Hearing Transcript at p. 6, L:1 – p. 7, L:24)

(33) The Court **FINDS** that the trial court made proper enquiry as to the Petitioner's mental status at the time of the plea, and correctly believed him to be competent to enter this plea.

(34) The Court **FINDS** that there was no reasonable basis for Petitioner's trial counsel to suspect that the Petitioner was not capable of cooperating with him, was incompetent to stand trial, or was not criminally responsible for his actions.

(35) The Court **FINDS** that Petitioner's trial counsel more than adequately investigated and prepared the Petitioner's case for trial.

(36) The Court **FINDS** that there was no basis for Petitioner's trial counsel to investigate the circumstances of the Petitioner's confession, as it was spontaneously made by the Petitioner, who admitted this fact to his trial counsel.

(37) The Court **FINDS** that at the time of his guilty plea, the Petitioner specifically acknowledged that he could not raise the issue of the voluntariness of his confession upon acceptance of his plea by the Court.

(38) The Court **FINDS**, given the circumstances of this case, the Petitioner's trial counsel achieved a masterful result for his client in that he:

(a) Got his client a plea which allowed him to plead to five (5) felonies when charged with twelve (12);

(b) Got him placed on probation with multiple attempt at treatment;

(c) Even though having a contested final probation hearing, somehow the Petitioner was not charged with two (2) more felonies, the commission of which in part led to his revocation.

(39) The Court **FINDS** that given the Petitioner's history, it would have summarily denied any Rule 35 motion.

(40) The Court **FINDS** that the Petitioner either lied to Judge Aboulhosn when entering his plea, or lied to this court during his omnibus hearing on the issue of his drug use at the time of the plea.

(41) The Court **FINDS** that the Petitioner is not a credible witness, based on this and other factors which are obvious from his sworn testimony at both hearings.

(42) The Court **FINDS** that there is no credible evidence to suggest any improper motive or conflict on the part of Trooper Long.

(43) The Court **FINDS** that Petitioner's trial counsel had numerous conferences with the Petitioner, and thoroughly reviewed the case and the plea agreement with the Petitioner.

(44) The Court **FINDS** that trial counsel's performance was more than adequate under an objective standard of reasonableness.

(45) The Court **FINDS** that, even if trial counsel made unprofessional errors (which he did not), the result of the proceedings would not have been different.

(46) The Court **FINDS** and concludes that the Petitioner has failed to prove that his trial counsel was ineffective by a preponderance of the evidence.

52

(47)     The Court **FINDS** and concludes that the Petitioner's claim that he received ineffective assistance of counsel is without merit.

## 2. WAS THE PETITIONER'S GUILTY PLEA KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY MADE?

### a. The Petitioner's Argument:

The West Virginia Supreme Court of Appeals has held that the state and federal constitutions mandate that all plea agreements be knowingly, intelligently and voluntarily made. *E.g., State ex rel. Gill v. Irons*, 207 W.Va. 199, 202, 530 S.E.2d 460, 463 (2000). In this case, due to defendant's drug use and the failure to investigate by trial counsel, defendant's guilty pleas were constitutionally deficient.

### b. The State's Response:

The State's Response is contained in 1.C., *Infra.*

### c. Findings of Fact and Conclusions of Law:

The Court makes the following specific findings of fact and conclusions of law on the voluntariness of the Petitioner's plea:

(1) The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

> A direct appeal from a criminal conviction based on a guilty plea will lie where an issue is raised as to the voluntariness of the guilty plea or the legality of the sentence.
> *State v. Sims*, 162 W. Va. 212, 248 S.E.2d 834, W. Va. 1978). Syl. pt. 1

53

(2)   The Court **FINDS** that the West Virginia Supreme Court

of Appeals also held in *Sims* that:

> The controlling test as to the voluntariness of a
> guilty plea, when it is attacked either on a direct
> appeal or in a habeas corpus proceeding on grounds
> that fall within those on which counsel might
> reasonably be expected to advise, is the competency
> of the advice given by counsel.  Syl. pt. 2.

(3)   The Court **FINDS** that the West Virginia Supreme Court

of Appeals also held in *Sims* that:

> Before a guilty plea will be set aside based on the
> fact that the defendant was incompetently advised,
> it must be shown that (1) counsel did act
> incompetently; (2) the incompetency must relate to
> a matter which would have substantially affected
> the fact-finding process if the case had proceeded to
> trial; (3) the guilty plea must have been motivated
> by this error.  Syl. pt. 3.

(4)   The Court **FINDS** that on the issue of involuntary guilty plea the

Petitioner gave the following testimony  at the omnibus habeas corpus

hearing:

Q  So the first one, involuntary guilty plea.  Was that

related to the fact that you were using drugs?

A  Yes.

Q  And was that also related to the fact that you don't

believe you were fully informed?

A  Yes.

(*See* Omnibus Habeas Corpus Transcript at p. 23, L:21 – p. 24,

L:3)

54

(5) The Court **FINDS** that on the issue of involuntary guilty plea the Petitioner also gave the following testimony at the omnibus habeas corpus hearing:

Q With regard to unfulfilled plea bargains, could you describe for the Court why you asked me to assert that on your behalf.

A Unfulfilled plea bargains?

Q Yes.

A Because at the time when I did get explained the plea bargain I was under the understanding that this would be run concurrent.

Q How did you have that understanding?

A With the talk that I had with Mr. Phillip Ball. I was under the understanding that it would be concurrent, which I was not knowledgeable about the law at that time, which is another reason I raised this ground because I didn't understand fully what he was telling me, especially with being on drugs. I did not feel I should have been - - made those decisions.

Q But you understood there was always the possibility of the judge running them consecutive. Is that right?

A Yes.

55

Q But you believed based on the advise (sic) that you were given by your attorney that they would be run concurrent.

A Yes.

Q You acknowledge that the plea bargain paperwork that you filled out stated that the judge would decide what the sentence would be?

A Yes, I do.

Q But you - - your testimony is that you relied on your lawyer and believed that the judge would grant concurrence.

A Yes.

Q Is that right?

A Yes.

(*See* Omnibus Habeas Corpus Transcript at p. 26, L:3 – p. 27, L:13)

(6) The Court **FINDS** that on the issue of involuntary guilty plea the Petitioner also gave the following testimony at the omnibus habeas corpus hearing:

Q Now, Mr. Franklin, you say that (sic) were on IV drugs so bad at that time that you didn't know what you were doing at the time of the plea?

A Yes.

56

Q But now you testified earlier that you remember doing drugs that morning.

A Yes.

Q And you remember the Court asking you if you had taken or used any drugs that day?

A Yes, I do.

Q And you remember lying?

A Yes.

Q Okay. So how do you explain the fact that you were on drugs so bad you didn't know what you were doing but yet you remember all of these facts from this long ago?

A I was using drugs the whole time, that's the thing. I had a drug problem.

(*See* Omnibus Habeas Corpus Transcript at p. 30, L:16 – p. 31, L:10)

(7)     The Court **FINDS** that on the issue of involuntary guilty plea the Petitioner also gave the following testimony at the omnibus habeas corpus hearing:

Q And during your plea hearing, did the Court ask you if you understood what the State (sic) case was against you?

A I don't remember that part.

(*See* Omnibus Habeas Corpus Transcript at p. 32, L:4 – 8)

57

(8)    The Court **FINDS** that on the issue of involuntary guilty plea the Petitioner also gave the following testimony at the omnibus habeas corpus hearing:

So did - - is your problem with Mr. Ball and the plea that he just didn't get you a good enough plea?

A  I felt it could have been better.

Q  He got you probation, did he?  You walked out of the courthouse that day, didn't you?

A  Yes, I did.

Q  Okay.  Well, how long were you on probation?

A  I was on probation for about a year.

(*See* Omnibus Habeas Corpus Transcript at p. 32, L:9 – 17)

(9)    The Court **FINDS** that on the issue of involuntary guilty plea the Petitioner also gave the following testimony at the omnibus habeas corpus hearing:

THE COURT:  All right.  Let me ask a couple of things here now, Mr. Franklin.

All right.  I'm just going through here trying to figure this out while we're - - how many charges did you have pending when you entered into this plea bargain agreement?

THE WITNESS:  I believe there was twelve.

THE COURT:  Twelve felonies.  Is that right?

58

THE WITNESS: Yes

THE COURT: Twelve felonies, because so far I've counted 11-F-930, Grand Larceny, 11-M-1761 Petit Larceny, 11-F-86, Grand Larceny, 11-F-857, Breaking and Entering, - - you all right, Mr. Cassell?

MR. CASSELL: Sorry, Judge.

THE COURT: Get him some water there, would you.

MR. CASSELL: I've got some.

THE COURT: 11-F-861, Grand Larceny; 11-F-852, Grand Larceny; 11-F-853, Receiving/Transferring Stolen Property; 11-F-854, Conspiracy; let's see what else we've got here now.

We'll take a break for a second.

(Off record)

(Back on the record)

THE COURT: Let's see. I've got one, two, three, four, five, six, seven, eight, nine, plus a misdemeanor in this file. And it looks like he plead to - - I don't see any deliveries, so there must be another file that has that in its. It says he plead to Grand Larceny, a Conspiracy, two Attempt to Commit a Felony and one Delivery, Hydromorphone. And I don't have any Hydromorphone warrants here, so I don't

59

know if they went straight to the Grand Jury. This is an Information here. They didn't arrest him or whatever.

All right. So you have - - by your count you have twelve felonies you're charged with here, right?

THE WITNESS: Yes, sir.

THE COURT: They let you plead guilty to five, right?

THE WITNESS: Yes, sir.

THE COURT: And you plead in front of Judge Aboulhosn; correct?

THE WITNESS: Yes, sir.

THE COURT: And the day you plead guilty in front of him, you didn't know what you were doing?

THE WITNESS: I was on drugs, sir.

THE COURT: You don't remember anything about it?

THE WITNESS: I remember asking a bunch of questions but - -

THE COURT: You asked a bunch of questions?

THE WITNESS: No. They asked a bunch of questions.

THE COURT: But you don't remember anything about it?

THE WITNESS: No.

THE COURT: But you do remember you used drugs, though, right?

THE WITNESS: Yes, sir.

THE COURT: I mean, you have specific recollection of using drugs that day, or are you just telling me you used them everyday so you assumed you did?

THE WITNESS: I assume I did since I was using them at the time.

THE COURT: Okay. And so you used all these drugs and the (sic) for some reason, I don't remember why, he transferred this to me for sentence. Do you know why he did?

THE WITNESS: I think it was conflicts.

THE COURT: What was the conflict? Remind me.

THE WITNESS: We - - me and my family use to go to church with him. I'm pretty sure he didn't want to hear that.

THE COURT: So he took your plea, right?

THE WITNESS: Right.

THE COURT: Sent you to me and I let you stay out on bond here, didn't I?

THE WITNESS: Yes, sir.

61

THE COURT: I see that in December - - or November, 2011, I let you stay out on bond and then I tried to keep working with you; looks like I had you until December, let you stay out, go to work, right? Remember all that?

THE WITNESS: Yes, sir.

THE COURT: Were you stoned that day? Were you drinking or using drugs then?

THE WITNESS: More than likely, yes, sir.

THE COURT: Well, then that's funny because here it says if you tested positive I was going to send you to the penitentiary. So I assume you were negative then. Are you tell (sic) me that they weren't testing you?

THE WITNESS: Diloted (sic) didn't stay in my system but twenty-four hours, sir.

THE COURT: So you were lying to me then. You were lying to my probation people. You were coming in here testing and being negative but you were still using Diloteds (sic) and they only last in your system for twenty-four hours.

THE WITNESS: I was using drugs the whole time.

THE COURT: You know enough about drugs and are that intelligent that you understand that; right?

THE WITNESS: Yes, sir.

62

THE COURT: Okay. So then I get you back in here on looks like the 28th - - or actually Judge Aboulhosn had you back because you violated your bond and he sent you to jail. You remember that?

THE WITNESS: Yes, sir.

THE COURT: Then looks like Judge Knight was here because I was in Monsanto then.

THE WITNESS: Yes, sir.

THE COURT: Judge Knight put a $5,000 PR bond in place and let you go to Legions (sic). Correct?

THE WITNESS: Yes, sir.

THE COURT: All right. So you had another hearing. Judge Sadler must have handled that for me because I was in Monsanto for quite a long time. And let me see, now, what happens then. Looks like Kim Moore has you.

You got thrown out of Legions (sic); right?

THE WITNESS: Yes, sir. It was a technicality.

THE COURT: You got thrown out of Legions (sic); right?

THE WITNESS: Yes, sir.

THE COURT: Okay. Were you using drugs when you were in Legions (sic)?

THE WITNESS: No, sir.

63

THE COURT: Then it looks like Judge Knight heard this for me against because I was still tied up, put on a $5,000 PR bond on home confinement with work release at your brother or father's residence, could not reside with your mom, you had to go to ninety NA meetings within ninety days, submit to substance abuse screenings once a week; right?

THE WITNESS: Yes, sir.

THE COURT: Then it looks like you got one to three for Attempt to Commit a Felony, one to five for Conspiracy, one to ten for Grand Larceny, let's see, one to three for another Attempt to Commit a Felony, one to fifteen for Hydromorphone, then it looks like I sentenced you and put you on probation for five years. That was December - - I mean, May 22nd, 2012. So you're out agin, right?

THE WITNESS: Yes, sir.

THE COURT: Okay. Then you're at the Day Report Center and apparently you must have - - unless you were - - it says here you tested negative forty-five times. That was from September 4th, 2012, because Ms. Ellison wanted you let off home confinement - - or let of (sic) Day Report Center because you worked.

64

So were you still using when you were testing negative?

THE WITNESS: I was using on and off at that time.

THE COURT: So you're using Diloteds (sic) and we've tested you forty-five times and never caught that, right?

THE WITNESS: Yes, sir.

THE COURT; So you were lying to us all, correct?

THE WITNESS: Yes.

THE COURT: Okay. We ever let you go from the Day Report Center.

And then finally it looks like on November 2nd there's an order that's entered - - a petition rather, and it looks like you got arrested for Breaking and Entering and Grand Larceny, October 21st, 2012, tested positive for Hydromorphone, Opiates and diluted screens. I guess we must have caught you then. Some how we lucked out.

Is that all right? Is that all true? That's what happened then, that we caught you?

THE WITNESS: Yes.

THE COURT: What happened on the Breaking and Entering and Grand Larceny from that? Was he charged with that too?

65

MR. MCGINNIS: Your Honor, that I'm not sure of.

THE COURT: Do you know?

MR. CASSELL: No, sir. I don't think he was ever charged, just used for the probation violation.

THE COURT: So he's got two more felonies out there. Fourteen felonies, right?

And then finally looks like I must have had enough and sentenced him November 19th, 2012. And so then I see you filed a habeas petition here where you attached a copy of a letter from your attorney, Mr. Ball where he said it was pointless to file a Rule 35.

Did you attach that to this?

THE WITNESS: Yes, sir.

(*See* Omnibus Habeas Corpus Transcript at p. 34, L:6 – p. 42, L:14)

(10) The Court **FINDS** that before entering his guilty plea, the Petitioner completed a series of documents with his counsel concerning his guilty plea. These state, in pertinent part:

11. What crime or crimes are charged in the Indictment in this case? **Grand Larceny, conspiracy, 2 Counts Attempt to Commit A Felony, Delivery Of Schedule II Controlled Substance Hydromorphone**

66

12. Do you know the penalty for the crime charged if you plead guilty, or are found guilty?   **Yes**

13. What is the penalty?   **Grand Larceny 1 to 10 yrs + Fine 2500**

14. If there are other offenses charged in this Indictment, what is the maximum penalty for each such included offense?   **Conspiracy – 1 to 5 yrs Fine 10,000, Attempt to Commit a Felony 1-3 yrs + 500.00 Fine, Delivery 1-15 years + $25,000.00**

15. Are you prepared to plead to this Indictment, or to any charge of crime contained therein?   **Yes**

16. What is your plea?   **Guilty Per Plea Above**

17. Before your "Plea of Guilty" may be accepted, it must appear of record that your plea is freely and voluntarily made with full knowledge of the consequences thereof, after being fully advised of your Constitutional Rights pertaining thereto.  The questions that follow are being asked in an effort to find out from you whether your plea is properly made.  You must understand that you are obligated to fully disclose to the Court at this time, all the facts and circumstances, which bear upon the voluntariness of your plea.  If you fail to bring such matters to the attention of the Court at this time, you may not, at any time

hereafter, attack or challenge the validity of your "Plea o Guilty." due to such matters. Having been so advised do you know and understand that you are obligated under the law to truthfully and fully answer all questions that are asked of you and to fully disclose to the Court at this time all matters about which the Court inquires? **Yes**

18. Have you been treated at any time for any mental illness? **Depression**

19. Are you under treatment now? **No**

20. Have you ever been addicted to drugs, that is, "hooked" on drugs? **Yes**

21. are you now under the care of any physician for any physical or mental disorder of any kind? **Yes**

22. Have you been under the influence of any drugs or alcohol or other stimulants while completing this questionnaire? **No**

23. Have you taken or consumed any alcohol, or any medicine or drug of any kind, within the previous 24 hours? **No**

24. If so, explain: **n/a**

27. Is your recollection impaired in any way? **No**

28. If so, explain. **n/a**

65. Are you satisfied with the services your attorney has given you in this case? **Yes.** Is there anything that he/she has done, or which he/she has failed to do for ou that you desire to discuss with the Court in private before your plea is accepted? **No**

66. Did you meet at any time with the Prosecuting Attorney, or any person representing that office, concerning your "Plea of Guilty," when your counsel was not present, before or after you were indicted? **No**

69. Do you know and understand that your decision to plead guilty is final and that your plea may not be withdrawn for any reason after it is accepted? **Yes**

70. Have you truthfully and fully answered all of these questions? **Yes**

(*See* Defendant's Statement In Support Of Guilty Plea)

(11) The Court **FINDS** that Petitioner's trial counsel also completed a document before the plea was entered:

16. If the answer to the above is yes, has that bargain been reduced to writing in its entirety and filed in this case? **Yes**

17. In your opinion, based upon your observations of him/her, is your client under the influence of any drugs or

stimulants, at the time of making the answers to his/her questions? **No**

Now having been duly sworn in the presence of the Court and the Defendant, **William David Franklin, II** I swear the above answers are true.

(*See* Attorney's Statement In Support Of Guilty Plea)

(12) The Court **FINDS** that the trial court went over these plea papers with the Petitioner during his plea:

Now let me go over these plea forms with you real quick. I've got the plea agreement which is on your attorney's - - it's a document that's three pages long, and it's gotten numbered paragraphs. Some of the numbered paragraphs have letters in it, and it's got one unnumbered paragraph. Have you seen this three-page document before?

THE DEFENDANT: Yes, sir.

THE COURT: This is the plea agreement between you and your attorney and the prosecuting attorney. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that I had nothing to do with this plea agreement?

THE DEFENDANT: Yes, sir.

70

THE COURT: Now, did you read this plea agreement?

THE DEFENDANT: Yes, sir.

THE COURT: If you had any questions about it, did your attorney answer those question (sic) to your satisfaction?

THE DEFENDANT: Yes.

THE COURT: All right. Is that your signature on the back page here?

THE DEFENDANT: Yes, sir.

THE COURT: I'll order that to be filed. The next thing I have is the petition to enter a plea of guilty; it's on a white piece of paper. It's got 16 numbered paragraphs, front and back. Have you seen this document before?

THE DEFENDANT: Yes, sir.

THE COURT: Is that your handwriting in that blue ink, or is that your attorney's handwriting?

THE DEFENDANT: Yeah, it's both.

THE COURT: Both you and your attorney. So you wrote down some - -

THE DEFENDANT: We filled it out together.

THE COURT: - - your attorney wrote down others. Is that correct?

THE DEFENDANT: Yes, sir.

71

THE COURT: So you've read this form, and you read the answers written down in these blanks. Is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: And you adopt everything on this form as your own answers. Correct?

THE DEFENDANT: Yes, sir.

THE COURT: If you had any questions about this form, did your attorney answer those questions to your satisfaction.

THE DEFENDANT: Yes, sir.

THE COURT: Is that your signature on the back page?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. I'll order that be filed.

I've got the defendant's statement to support a guilty plea; it's on three pages of goldenrod paper. The first two pages are front and back, the last page is front only. It's got 73 numbered paragraphs, and it's got some handwriting in blue ink. Have you seen these forms before?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Is that your handwriting of your attorney's handwriting, or a combination of both?

MR. BALL: Both.

THE DEFENDANT: Both.

72

THE COURT: Okay. So even though your attorney wrote down some of the answers, and you wrote down some of the answers, you read all these answers?

THE DEFENDANT: Yes, sir.

THE COURT: You adopt them all as your own answers?

THE DEFENDANT: Yes, sir.

THE COURT: If you had any questions about this form, did your attorney answer those to your satisfaction?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Is that your signature on the front and back of the first two pages?

THE DEFENDANT: Yes, sir.

THE COURT: And is that your signature on the front of the last page that's been notarized?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. I'll order that be filed.

Next, I've got the attorney's statement to support a guilty plea. It's been signed and notarized by counsel. I'll order that be filed.

Next, I've got a plea of guilty; it's on a white piece of paper. It's got some handwriting in blue ink on the front

and back. My guess is it's probably your attorney's handwriting. Is that correct?

THE DEFNDANT: Yes.

THE COURT: On the front and back of that, or a combination of back.

THE DEFENDANT: Combination.

THE COURT: All right. So even though your attorney may have written down some of these answers, you adopt everything on this form as your own?

THE DEFENDANT: Yes, sir.

THE COURT: All right. If you had any questions about this form, did your attorney answer those to your satisfaction?

THE DEFENDANT: Yes sir.

THE COURT: Is that your signature on the front page here?

THE DEFENDANT: Yeah.

THE COURT: I'm going to hand this to the bailiff and ask that you sign this, the back page, in open court please.

(Defendant responds to direction of the Court.)

THE COURT: I'll order the attorney's statement in support - - I mean, the plea of guilty be filed with the Court, as well.

74

(*See* Plea Hearing Transcript at p. 31, L:14 – p. 36, L:10)

(13)     The Court **FINDS** that the trial court specifically addressed the voluntariness of the Petitioner's plea with him during the plea colloquy:

THE COURT:  Do you freely and voluntarily tender this plea agreement to the Court?

THE DEFENDANT:  Yes.

(*See* Plea Hearing Transcript at p. 40, L:10 -12)

(14)     The Court readopts all of the relevant findings made in III.C.1, *infra.*, as if fully set forth herein.

(15)     The Court **FINDS** and concludes that the Petitioner has failed to produce any evidence sufficient to prove by a preponderance of the evidence that his plea was not knowingly, voluntary, and intelligently made.

(16)     The Court **FINDS** and concludes that the Petitioner's claim that his plea was not knowingly, voluntarily, and intelligently made is without merit.

## 3.  DID THE PETITIONER RECEIVE A DISPROPORTIONATE SENTENCE?

### a.  The Petitioner's Argument:

Petitioner asserts that this sentence violates the proportionality principals found in the U.S. and state constitutions.  According to this Court, "[b]oth the United States Constitution and the West Virginia Constitution prohibit sentences which are

75

disproportionate to the crimes committed." E.g., State v. Richardson, 214 W.Va. 410, 413, 589 S.E.2d 552, 555 (2003). This Court has established a two stage analysis for determining if a sentence is disproportionate. First, the subjective test is analyzed. According to the Cooper court, "[p]unishment may be constitutionally impermissible...if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity..." State v. Cooper, 172 W.Va. 266, 304 S.E.2d 851 (1983) at Syll. Pt. 5.

If the sentence does not shock the conscience of the court, then the second objective test is evaluated. In that test, numerous factors are examined to determine if the sentence is disproportionate. Factors to be considered include the age of the defendant, prior record of the defendant, rehabilitative potential (including post arrest conduct, age and maturity), statements of the victim, evaluations made in anticipation of sentencing, and remorse of the defendant. Id. at 271-272, 856; see also State v. Booth, 224 W.Va. 307, 314, 685 S.E.2d 701, 708 (2009). Sentences within legal guidelines can transgress the proportionality principles. E.g. State v. David, 214 W.Va. 167, 177, 588 S.E.2d 156, 166 (2003), State v. Richardson, 214 W.Va. 410, 413, 589 S.E.2d 552, 555 (2003), c.f. State v. Slater, 222 W.Va. 499, 665 S.E.2d 674 (2008).

In the case at bar, Petitioner's lack of criminal record, drug use at the time of committing the offenses, family support and other factors, support a finding that the sentence imposed was constitutionally disproportionate.

b. **The State's Response:**

The State also disputed the Petitioner's contention that the Petitioner's sentence was disproportionate under the State and Federal Constitutions. The Petitioner was

sentenced on five different crimes, with all run consecutively for 5-36 years. However, the sentence was suspended and the Petitioner was placed on probation. The State contends that the original sentence was appropriate and does not shock the conscience or offend fundamental notions of human dignity. Furthermore, the State contends that the appropriateness of the sentence is further exhibited by the fact that the sentence was suspended and the Petitioner was placed on probation. It was not until the Petitioner violated his probation that he was re-sentenced and the original sentence imposed.

c. **Finding of Fact and Conclusions of Law:**

(1) The Court **FINDS** that the trial court's sentence was within statutory limits and was not based on impermissible factors. *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (W. Va. 1981) at syl. Pt. 4, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

(2) The Court **FINDS** that sentences which are within the statutory limits are not entitled to statutory review. *State v. Koon*, 190 W. Va. 632, 440 S.E.2d 442 (1993).

(3) The Court **FINDS** that, while constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed maximum set by or where there is a life recidivist statute. *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981). at syl. Pt. 4. The sentences in this action are not of either type.

(4) The Court **FINDS** that on the issue of consecutive sentences the Petitioner gave the following testimony at the omnibus habeas corpus hearing:

Q Consecutive sentences for the same transaction. That's obvious. You received consecutive sentences in this case. Is that correct?

A Yes.

77

(*See* Omnibus Habeas Corpus Transcript at p. 25, L:5 – 8)

(5)  The Court **FINDS** that on the issue of consecutive sentences the Petitioner gave the following testimony at the omnibus habeas corpus hearing:

Q Severer sentence than expected, is that related to the - - what you just provided about your anticipation to a concurrent sentence?

Yes.

Q Excessive sentence, we've talked about there (sic) other factors that go into play with regard to sentence, you had no prior criminal record, you had family support, you had drug issues and were going through things in your personal live (sic). Is that right?

A Yes.

(*See* Omnibus Habeas Corpus Transcript at p. 28, L:6 – 15)

(6)  The Court **FINDS** that on the issue of consecutive sentences the Petitioner gave the following testimony at the omnibus habeas corpus hearing:

Q Mistaken advise (sic) of counsel as to parole or probation eligibility, is that related to the concurrence again?

A Yes.

Q Because they weren't concurrent, you ended up being eligible for probation far later than you ever expected.

A Right.

Q Amount of time served on sentence, this was related to your home confinement time. Describe for the Court your concern there.

78

A  I believe that I had more time than I was credited for.  If I do remember, I was on home confinement for almost a year the first time awaiting to go to trial.  And then I was put back on it for three more months.  I was credited for 257 days but I believe it should be more than that.

Q  And I've advised you that the credit for home confinement time is left to the direction of the Court?

A  Right.

(*See* Omnibus Habeas Corpus Transcript at p. 28, L:16 – p. 29, L:13)

(7)  The Court **FINDS** that before entering his guilty plea, the Petitioner answered questions in his plea paperwork about his understanding of sentencing, specifically that no promises or representations had been made:

37.  Do you know and understand that this Court will not be bound by an agreement or recommendation by the Prosecuting Attorney that pertains to the sentence you will receive if you plead guilty in this case; and do you know that the matter of sentencing is strictly for the Court to decide; and that the Court will not be obligated, or required to give any effect whatsoever to such recommendations?  **Yes**

38.  Has anyone made promises or representation to you as to how the Judge of this Court will dispose of our case with regard to sentence?  **No**

39.  Do you understand that the Judge alone, as guided by law, will make the decision as to what sentence will be given with regard to your plea?  **Yes**

40.  Except as shown by your plea bargain, if any filed in this case, has anyone promised you leniency, a lighter sentence, probation, or promised not to prosecute you for some other offense or offenses, or offered or paid you money, or offered or gave you property, or by any means whatsoever, included you, led you, persuaded you, or otherwise caused you to plead guilty?  **No**

79

41. Except as shown by your plea bargain, if any, filed in this case, has anyone threatened you with a denial of probation, or with a more severe sentence, or with prosecution for some other offense or offenses, or with harm or injury to your person or property, if you were to plead "not guilty," or in any matter, by any means, coerced you, scared you, forced you, or otherwise caused you to plead guilty?  **No**

(*See* Defendant's Statement In Support Of Guilty Plea)

(8) The Court **FINDS** that the trial court reviewed the potential sentences with the Petitioner during the hearing, specifically the fact that he could be sentenced to five (5) to thirty-six (36) years for these crimes:

Mr. Franklin, you heard your attorney outline the plea agreement. Is that your understanding of the plea agreement, as well?

THE DEFENDANT: Yes, sir.

THE COURT: Is there anything that he's failed to mention as part of the plea agreement that you think should have been mentioned to the Court?

THE DEFENDANT: No, sir.

THE COURT: Okay. Now, you understand any recommendations made by your attorney with regard to punishment or probation are merely recommendations, and that I'm not bound by those recommendations?

THE DEFENDANT: Yes, sir.

THE COURT: And if I decide to incarcerate you on these offenses, you can't ask to have your plea withdrawn because I've decided to incarcerate you. Do you understand that?

THE DEFENDANT: Yes, sir.

80

THE COURT: Okay. Do you know the maximum punishment that you could receive for the various charges that have been filed against you in this case?

THE DEFENDANT: Yes, sir.

THE COURT: What are they?

THE DEFENDANT: Five to 36 years.

THE COURT: Do you understand it's one-to-three on each of the attempt to commit a felonies; it's one-to-five on the conspiracy; and then it's one-to-ten on the grand larceny; and one-to-fifteen on the delivery charge? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And if I ran them all consecutive, like you said, it would be what, five to - -

THE DEFENDANT: Five to 36.

THE COURT: Exactly.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Now, based on what I've told you so far, do you still desire to enter your plea of guilty?

THE DEFENDANT: Yes, sir.

(*See* Plea Hearing Transcript at p. 15, L:10 – p. 17, L:4)

(9) The Court **FINDS** that the trial court further addressed this topic with the Petitioner during his plea:

81

THE COURT: Has anyone promised you leniency or a lighter sentence to get you to enter into this plea of guilty, other than the plea agreement itself?

THE DEFENDANT: No, sir.

THE COURT: Has anyone promised you probation?

THE DEFENDANT: No, sir.

(*See* Plea Hearing Transcript at p. 27, L:9 – 16)

(10)    The Court **FINDS** and concludes that the Petitioner did not receive consecutive sentences for the same transaction.

(11)    The Court **FINDS** and concludes that the Petitioner did not receive a severer sentence than expected.

(12)    The Court **FINDS** and concludes that the Petitioner did not receive disproportionate sentences.

(13)    The Court **FINDS** that the Petitioner was fully aware at the time of his plea that he could receive an effective sentence of five (5) to thirty-six (36) years.

(14)    The Court **FINDS** that the Petitioner was sentenced for five (5) felonies when he could have been tried and found guilty of fourteen (14).

(15)    The Court **FINDS** and concludes that the Petitioner has failed to prove by a preponderance of the evidence that he received a disproportionate sentence.

(16)    The Court **FINDS** and concludes that the Petitioner's claim that he received a disproportionate sentence is without merit.

## 4. WERE THE PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS VIOLATED BY THE CUMULATIVE EFFECT OF THE ERRORS CITED HEREIN?

### a. The Petitioner's Argument:

Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) *cited with approval in United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002). Thus, the West Virginia Supreme Court has held that "[w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." *Syllabus Point 5, State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972).

In the case at bar, the overwhelming number of errors concerning many aspects of the case warrant a finding that Petitioner's trial was unfair.

### b. Respondent's Response:

The State did not respond to this assertion.

### c. Findings of Fact and Conclusions of Law:

1. The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

> Where the record of a criminal trial shows that the **cumulative** effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing along would be harmless error. *State v. Smith*, 156 W.Va. 385, 193, S.E.2d550 (W.Va. 1972) syl.

83

pt. 5. *See* also, *State v. Schermerhorn*, 211 W.Va. 376, 566 S.E.2d 293 (2002); and *State v. Cook*, ___ S.E.2d ___, 2010 W.L. 4275253 (W.Va.).

2. The Court **FINDS** and concludes that because none of the allegations of error asserted above constitute grounds to grant the Petition, the claim of cumulative error which unfairly prejudiced the Petitioner is without merit.

# 5. HAS THE PETITIONER BEEN SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT?

a. **Petitioner's Argument:**

Petitioner asserts that his federal and state constitutional rights were violated in that he has been subjected to cruel and unusual punishment. The West Virginia Supreme Court specifically recognizes that *habeas corpus* does lie to address the constitutionality of the conditions of confinement. *Crain v. Borden Kircher* (sic), 176 W. Va. 338, 342 S.E. 2d 2422 (1986). Specifically, *habeas corpus* may be used to secure relief for conditions of which constitute cruel and unusual punishment in violation of the provisions of Article 3, Section 5 of the Constitution of West Virginia and of the Eighth Amendment to the Constitution of the United States. *Id.* The Supreme Court specifically recognizes the conditions of jail confinement that can be found to be violative of the constitution include issues relating to provision of medical care. *Id.* at 343, 427.

In this case Petitioner asserts that he has or is being subjected to:

1. Inadequate medical treatment;

2. Improper delivery of mail;

3. Inadequate access to the law library;

4. Inadequate access to personal hygiene products;

5. Inadequate access to recreation;

6. Interference with religious worship; and

7. Other issues.

For all these reasons, Petitioner asserts that his confinement is unconstitutional.

b. **State's Response:**

Lastly, the State disagrees with the Petitioner's contention that he is entitled to relief on the grounds that he is being subjected to cruel and unusual punishment in the WV Department of Correction.

c. **Findings of Facts and Conclusions of Law:**

(1) The Court **FINDS** that the United States Constitution states that:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. *U. S. Constitution, 8th Amendment*

(2) The Court FINDS that the W. Va. Constitution states that:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. Penalties shall be proportioned to the character and degree of the office. No person shall be transported out of, or forced to leave the state for any offence committed within the same; nor shall any person, in any criminal case, be compelled to be a witness against himself, or be twice put in jeopardy of life or liberty for the same offence. *W. Va. Constitution Article 3 §5.*

(3) The Court **FINDS** that the W. Va. Supreme Court of Appeals has held that:

> Habeas corpus lies to secure relief from conditions of imprisonment which constitute cruel and unusual punishment in violation of the provisions of Article III, Section 5, of the Constitution of West Virginia and of the Eighth Amendment to the Constitution of the United States.

85

*State ex rel. Roger Ray Pingsley v. Coiner,* 155 W. Va. 591, 186 S. E. 2d 220 (1972).

(4) The Court **FINDS** that the W. Va. Supreme Court has also held that:

> Certain conditions of jail confinement may be so lacking in the area of adequate food, clothing, shelter, sanitation, medical care and personal safety as to constitute cruel and unusual punishment under the Eight Amendment to the United States Constitution. *Hickson v. Kellison,* 170 W. Va. 732, 2967 S. E. 2d 855 (1982).

(5) The Court **FINDS** that on the issue of cruel and unusual punishment the Petitioner gave the following testimony at the omnibus habeas corpus hearing:

Q And while you were at the Eastern Regional Jail you had pretty significant difficulty with regard to the - - how you were being treated at that facility. Is that right?

A Yes, I was.

Q And those conditions existed for a substantial period of time. How long were you there?

A I was there for about a year and a half.

Q While you were there, did you have issues with regard to not receiving your mail?

A Yes. I was having - -

Q Describe that for the Court.

A I was having trouble getting legal mail. I wasn't getting it at all, that was the biggest issue.

Q How did you know you weren't receiving mail?

86

A Because I would ask my mom to contact you or whoever it was that I expecting to receive it from and they said that they'd already sent it out and I never got it.

Q You mean the postmark where the mail puts on it where they stamp the stamp?

A Yes.

Q It would be from months before?

A Yes.

Q Did you also have difficulties there with regard to access to the law library?

A Yes, I did. I filed several grievances over that issue. I couldn't get there. Once I did get there, I filed several legal issues and had the counselor there at Eastern Regional go to make copies for me and to notarize it and she ended up losing the paperwork.

Q Did you have issues with regard to access to personal hygiene products?

A Yes.

Q Describe that for the Court

A They just - - they wouldn't give you any hygiene products at all. When we did complain about it, they'd just - - they would shake down the cells and say well, you've got plenty of toilet paper, or whatever it is that they were looking for and they would say if we needed some they'd go look for it in somebody else's cell.

87

Q Did you have problems with access to recreation?

A Yes. That was a daily problem. They wouldn't call it (sic) all and when we did complain about it, like I said, they'd just harass us over it.

Q Did you also have problems with regards to interference with religious worship?

A Yeah.

A Describe that for us.

A There was several times they did not call church service and when they would call it they said only two people could go and there's almost - - well, there's thirty-two people in the pod, so pretty much saying only two people were allowed to go to religious services.

Q Now all these issues fail in comparison with regard to the medical treatment. Were you have (sic) problems with medical treatment at that facility?

A Yeah. Seeing the medial - -

Q Describe for the Court what those problems were.

A A lot of the problems was I was complaining about the depression and the mental illness problems. And I'm still having an issue with that now but it's not - - I don't believe I'm on the proper medicine. I've requested to see another doctor or you know, be placed on something that would work. I'm still having problems with that.

Q So you're having problems with regard to get (sic) your treatment for depression both at that facility and at Stevens now?

88

A Yes.

*(See* Omnibus Habeas Corpus Transcript at p. 20, L:9 – p. 23, L:15)

(6) The Court **FINDS** that, even if true, these allegations do not rise to the level contemplated to constitute cruel and unusual punishment, as was found in *State of W. Va. ex. Rel. K. W. and C. W. V.* Werner, 161 W. Va., 192, 242 S. E. 2d 907, (W. Va. 1978); (finding cruel and unusual punishment at the West Virginia Industrial School for Boys by the use of "bench time," "floor time," solitary confinement, beating, slapping, kicking, or otherwise physically abusing juveniles incarcerated therein) and *Crain v. Bordenkircher*, 176 W. Va. 338, 3425 S.E. 2d 422, (W. Va. 1986) (finding cruel and unusual punishment existed at the West Virginia Penitentiary at Moundsville that reached such a level that the State entered into a Consent Decree that emcompassed the revision of various prison policies and the appointment of a Special Master whose duties would be to monitor the implementation of and compliance with the final decree).

(7) The Court **FINDS** and concludes that the Petitioner's allegations that he is being subjected to cruel and unusual punishment is without merit.

## 6. WERE THERE ANY OTHER GROUNDS RAISED BY THE PETITIONER WHICH WERE SUFFICIENT TO GRANT HIM RELIEF, SPECIFICALLY, WAS THERE SUFFICIENT EVIDENCE UPON WHICH TO BASE HIS PLEA?

**a. Petitioner's Argument:**

Petitioner also hereby asserts all grounds raised in his *Losh* checklist filed contemporaneously herewith and in his original Petition.

89

**b. State's Response:**

The State did not reply to this assertion.

**c. Findings of Fact and Conclusions of Law:**

(1) The Court **FINDS** that on the issue of sufficiency of evidence the Petitioner gave the following testimony at the omnibus habeas corpus hearing:

Q Sufficiency of the evidence, is that because of the fact you just didn't know what the evidence was against you?

A Right. I have no idea what the evidence was.

(*See* Omnibus Habeas Corpus Transcript at p. 28, L:2 – 5)

(2) The Court **FINDS** that the trial court established at the time of the plea that there was sufficient evidence upon which to base the Petitioner's plea of guilty:

All right. The next thing I want to do, Mr. Franklin, is I want you to pay very close attention to the prosecuting attorney. She's going to outline what the evidence would have been had this matter gone to trial, and I'm going to be asking you some questions about that, so I want you to pay very close attention to what she says. Okay?

Ms. Harshbarger?

MS. HARSHBARGER: Thank you, Your Honor.

Your Honor, the evidence would deal with multiple occasions. In regards to Count 1 with the attempt to commit a felony, the evidence would show that onn February 28, 2011, Mr. Franklin pulled into the Lowe's parking lot, cut a cable securing a John Deere mower, and he loaded it onto a trailer.

90

In regards to Count 2, the conspiracy, that evidence would show that the - - that Mr. Franklin gave a statement in which he admitted that he and another individual named Jeff Hambrick stole a tractor from the John Deere Center, and sold the tractor to an individual named Leslie Thomason.

In regards to Count 3, which is the grand larceny, the evidence would show that on or about March 13, 2011 Mr. Franklin stole a red 2007 Yamaha, and that was from an individual named - - the victim's name was Paul Carroll in that particular case.

In regards to Count 4, the evidence would show that on or about between March 27th and March 28th, Mr. Franklin stole from, I think it was, Via's Lawn and Garden, stole a utility trailer which values at $1,500.00

In regards to Count 5, which is delivery of a Schedule II controlled substance, Hydromorphone, this case has not actually been charged yet, but the evidence would show that the Defendant sold and delivered that controlled substance to a CI.

THE COURT: Thank you, Ms. Harshbarger.

Mr. Franklin, you heard what the prosecutor has outlined is the evidence in this case. Do you agree with that?

THE DEFENDANT: Yes, sir.

THE COURT: Are you pleading guilty because you are in fact guilty of all of these offenses?

THE DEFENDANT: Yes, sir.

(See Plea Hearing Transcript at p. 36, L:11 – p. 38, L:8)

91

(3) The Court **FINDS** and concludes that there was sufficient evidence upon which the Petitioner's plea of guilty could be substantiated.

(4) The Court **FINDS** and concludes that the Petitioner has failed to prove by a preponderance of the evidence that other grounds exist which entitles him to relief.

(5) The Court **FINDS** and concludes that the Petitioner's claim that there are other grounds raised by him in his Petitions which entitle him to relief is without merit.

## D. RULING

Wherefore, for the reasons set forth in the foregoing opinion order, the Court hereby orders and adjudges as follows:

1. That the Petitions for Writ of Habeas Corpus *ad Subjiciendum* are hereby denied and this action is removed from the docket of this Court.

2. The Court appoints Paul R. Cassell, Esq., to represent the Petitioner should he choose to appeal this ruling.

3. This is the final order. The Circuit Clerk is directed to distribute a certified copy of this Order to Paul R. Cassell, Esq., at his address of 340 West Monroe Street, Wytheville, Virginia, 24382; to Scott A. Ash, Esq., Prosecuting Attorney of Mercer County, West Virginia, at his address of 120 Scott Street, Suite 200, Princeton, West Virginia, 24740; and to the Petitioner, William David Franklin, c/o Parkersburg Correctional Center, 225 Holiday Hills Drive, Parkersburg, West Virginia, 26104

Entered this the 8th day of May, 2015.

DEREK C. SWOPE, JUDGE

THE FOREGOING IS A TRUE COPY OF A DOCUMENT ENTERED IN THIS OFFICE ON THE ___8th___ DAY OF ___May___ 20___ DATED THIS ___8th___ DAY OF ___May___ 20___

JULIE BALL, CLERK OF THE
CIRCUIT COURT OF MERCER COUNTY, WV

92